NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12367

RACHEL C. WILLIAMS[1]  vs.  AMERICAN HONDA FINANCE CORPORATION.


Suffolk.     December 7, 2017. - June 5, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Cypher, & Kafker, JJ.


Motor Vehicle Instalment Sales, Repossession, Notice.  Uniform Commercial Code, Notice.  Words, "Fair market value."



Certification of questions of law to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.


John J. Roddy (Elizabeth A. Ryan also present) for the plaintiff.
Eric S. Mattson, of Illinois (Tracy McDevitt Waugh also present) for the defendant.
Fredrick S. Levin, John C. Redding, & Ali M. Abugheida, for American Financial Services Association, amicus curiae, submitted a brief.
Stuart T. Rossman, for National Consumer Law Center, amicus curiae, submitted a brief.


KAFKER, J.  The primary issue presented in this case is how

to establish the fair market value of a repossessed automobile

_____

[1] Individually and on behalf of all others similarly situated.

pursuant to G. L. c. 255B, § 20B.  Under § 20B, a creditor who repossesses and sells a vehicle is entitled to recover from the debtor the deficiency, if any, that remains after deducting the "fair market value" of the vehicle from the debtor's unpaid balance.  The plaintiff in this case, Rachel Williams, defaulted on her automobile loan, causing the defendant, American Honda Finance Corporation (Honda), to repossess and sell the vehicle that served as collateral for the loan.  The price for the repossessed vehicle was determined at an auction open to licensed dealers.  Honda then used that amount to establish the fair market value of the repossessed automobile and likewise referenced the auction sale amount in presale and postsale notices to the debtor.  Williams then sued Honda, alleging that the fair market value of her repossessed automobile was the fair market retail value of the automobile and Honda's notices to her were insufficient under Massachusetts law because of the manner in which Honda described and calculated her deficiency.  The United States District Court for the District of Massachusetts granted summary judgment to Honda, and the plaintiff appealed.

Unsure of the meaning of the statute, the United States Court of Appeals for the First Circuit certified to this court three questions related to the calculation of "fair market value" under § 20B, and the notices that are required with respect to this calculation.  The court first asks whether the

fair market value of the collateral under § 20B is the fair market retail value of the collateral.  The second and third questions then relate to the contents of the presale and postsale notices that must be sent to the debtors.

We conclude that the Legislature required that deficiency calculations for repossessed vehicles be determined based on the fair market value of the vehicle, but did not dictate the creditor's market choice in the first instance and left the ultimate determination of fair market value to the courts in contested cases, taking into account both creditor and debtor interests, and the means, methods, and markets used to sell the vehicle.  As will be explained infra, estimated retail value as provided in periodically published trade journals has a very limited role in the statute, essentially establishing a rebuttable evidentiary presumption that allows a debtor to put the fair market value as originally determined by the creditor to the test in contested cases.  The approach to determining fair market value and deficiencies that we delineate respects the plain language of the statute, the legislative history, and the practical realities of the automobile repossession market. Had the Legislature intended to impose a fair market retail value standard, it would have simply said so in the statute or the legislative history, and it did not.

Finally, in response to the second and third questions, concerning the notice that is required, we answer that the presale and postsale notices provided to the debtor must expressly describe the deficiency as the difference between the amount owed on the loan and the fair market value of the vehicle, not the difference between the amount owed and the sale proceeds or the amount owed and the fair market retail value of the vehicle.

1. Background. The relevant facts and procedural history are as follows.

Honda resells tens of thousands of used motor vehicles every year -- some after a repossession, but most after they have been returned to Honda at the end of a lease. To sell all of these vehicles, Honda uses a process that the plaintiff has admitted is "designed to obtain the highest possible price." The first step in this process involves an independent auction company rating the vehicle's condition on a scale from zero to five, with zero representing the "very worst" and five the "very best." With the vehicle's grade in mind, a Honda employee consults the Black Book to help establish a baseline value for vehicles it resells. The Black Book is a guidebook used in the collections, customer service, and credit industry. Honda determines a "floor price" -- the minimum it intends to accept when it sells the vehicle -- based in part on the Black Book's

estimated values for a vehicle of the same make, model, year, mileage, and condition.  After a floor price is set, the vehicle is sold, along with vehicles from other manufacturers, at a biweekly auction that is open to licensed dealers.

Honda uses auctions rather than a retail channel to sell these vehicles for a variety of reasons.  Honda is not licensed to sell at retail, and selling at retail may interfere with the legal rights of independent Honda dealers.  It also would take Honda a longer time to sell these vehicles at retail than selling at the dealer auctions.  This is significant because automobiles depreciate rapidly and the longer a creditor retains possession of a vehicle, the less it will be worth when it is eventually sold.

Honda financed the purchase of the plaintiff's vehicle in 2007.  Four years later, after the plaintiff defaulted on her loan, Honda repossessed the vehicle.[2]  Honda then provided the plaintiff with the following notice:

> "We have [your vehicle] because you broke promises in our agreement, and we will sell it at a private sale sometime after October 11, 2011.
>
> "The money received from the sale (after paying our costs) will reduce the amount you owe.  If the auction proceeds are less than what you owe, you will still owe us the difference.  If we receive more money than you owe, you will receive a refund, unless we must pay it to someone

---

[2] The plaintiff's account with Honda was delinquent at least twenty-four times before Honda repossessed the vehicle.

else. If you would like a written explanation on how the amount you owe was determined, or need additional information about the sale, please send your request to the address below.

"You can get the property back at any time before we sell it by paying the full payoff amount, including our expenses. As of today, the payoff amount is $13,366.78, which is subject to change due to the addition of applicable fees and/or finance charges."

The plaintiff's repossessed vehicle was sold according to the auction process. The independent auction company determined that the plaintiff's vehicle was in below average condition. For Honda, this meant that the vehicle was in "rough" condition for purposes of the Black Book. According to the Black Book, the estimated wholesale value for this vehicle in "rough" condition was $7,750 and the estimated retail value was $9,800. With these values in mind, Honda set the floor price for the plaintiff's vehicle at $8,700 and ultimately sold the vehicle for $8,900. The plaintiff's outstanding balance was $12,858.70, and Honda incurred repossession and auction expenses of $754.62, leaving the plaintiff with a postsale deficiency of $4,713.32. After the auction, Honda notified the plaintiff that her vehicle was sold for $8,900 and provided her with a calculation of the deficiency that she owed. There is no indication that Honda, once it sold the vehicle and calculated the deficiency, intended to file a lawsuit to collect the deficiency. Indeed, Honda has

brought only five or fewer such lawsuits in the past few years despite selling thousands of repossessed automobiles.

The plaintiff commenced a putative class action in the Superior Court against Honda, claiming that the notices it sent to her and other debtors violated the Uniform Commercial Code and constituted an unfair and deceptive act or practice in violation of G. L. c. 93A. The plaintiff challenges Honda's presale notice because it did not use the term "fair market value" in describing her deficiency. The plaintiff also challenges the postsale notice, arguing that it is insufficient because it calculated her deficiency as the difference between her unpaid balance and the auction proceeds.

Honda removed the case to the United States District Court for the District of Massachusetts. Following discovery, both parties moved for summary judgment. A magistrate judge recommended granting summary judgment in favor of Honda, concluding that under G. L. c. 255B, § 20B, the plaintiff's deficiency must be calculated using the fair market value of the collateral and that Honda's notices complied with the Uniform Commercial Code because there was no evidence that Honda sold the vehicle for less than its fair market value. The district court judge adopted this recommendation and entered judgment in favor of Honda.

The plaintiff appealed to the United States Court of Appeals for the First Circuit. Having determined that the outcome of the case depended on unsettled questions of Massachusetts law, the First Circuit on its own motion certified three questions to this court. We address each question in turn.

2. <u>Discussion</u>. a. <u>Question one</u>. The first certified question asks:

> "1. Whether the 'fair market value' of collateral under [G. L. c. 255B, § 20B,] is the fair market <u>retail</u> value of that collateral" (emphasis in original)?

For the reasons detailed <u>infra</u>, we answer this question, "No."

i. <u>Statutory language</u>. "[T]he primary source of insight into the intent of the Legislature is the language of the statute." <u>International Fid. Ins. Co.</u> v. <u>Wilson</u>, 387 Mass. 841, 853 (1983). "Where the language is clear and unambiguous, it is to be given its 'ordinary meaning,'" as long as "this meaning . . . [is] reasonable and supported by the purpose and history of the statute" (citations omitted). <u>Commonwealth</u> v. <u>Mogelinski</u>, 466 Mass. 627, 633 (2013).

By its plain language, G. L. c. 255B, § 20B, calculates the deficiency that the creditor can obtain from a defaulting debtor based on the fair market value of the collateral.[3] Once the

---

[3] General Laws c. 255B, § 20B (<u>e</u>), provides:

creditor repossesses and sells the collateral, the creditor "shall be entitled to recover from the debtor the deficiency, if any, resulting from deducting the fair market value of the collateral from the unpaid balance due" in addition to any "reasonable repossession and storage costs." G. L. c. 255B, § 20B (e) (1).

"Fair market value" was not a novel or undefined term when the Legislature used it in enacting G. L. c. 255B, § 20B, in 1973. As we have repeatedly held, fair market value is "the highest price which a hypothetical willing buyer would pay to a hypothetical willing seller in an assumed free and open market" (citation omitted). Epstein v. Boston Hous. Auth., 317 Mass. 297, 299 (1944). See Boston Gas Co. v. Assessors of Boston, 458 Mass. 715, 717 (2011), quoting Boston Gas Co. v. Assessors of Boston, 334 Mass. 549, 566 (1956) ("the price an owner willing

---

"(e) (1) If the unpaid balance of the consumer credit transaction at the time of default was [$2,000] or more the creditor shall be entitled to recover from the debtor the deficiency, if any, resulting from deducting the fair market value of the collateral from the unpaid balance due and shall also be entitled to any reasonable repossession and storage costs, provided he has complied with all provisions of this section.

"(2) In a proceeding for a deficiency the fair market value of the collateral shall be a question for the court to determine. Periodically published trade estimates of the retail value of goods shall, to the extent they are recognized in the particular trade or business, be presumed to be the fair market value of the collateral."

but not under compulsion to sell ought to receive from one willing but not under compulsion to buy"); Bradley v. Hooker, 175 Mass. 142, 143 (1900) ("the highest price that a normal purchaser not under peculiar compulsion will pay at the time and place in question in order to get the thing"). In the instant case, the collateral was sold in an automobile auction open to licensed dealers. The price set in such an open market is compelling, albeit not conclusive evidence, of the fair market value of the repossessed automobile. Compare Matter of Excello Press, Inc., 890 F.2d 896, 904-905 (7th Cir. 1989) ("The product of a commercially reasonable sale is the fair market value. . . . The price obtained in a commercially reasonable sale is not evidence of the market value, which can be discounted or thrown out. It is the market value"). In the instant case, it is also admitted that the auction process was "designed to obtain the highest possible price."

The statute goes one step further to protect debtors in the event that the creditor sues to recover the remaining deficiency. Section 20B (e) (2) provides that, "[i]n a proceeding for a deficiency the fair market value of the collateral shall be a question for the court to determine." When making this determination, the statute introduces an evidentiary presumption that "[p]eriodically published trade estimates of the retail value of goods shall, to the extent they

are recognized in the particular trade or business, be presumed to be the fair market value of the collateral." G. L. c. 255B, § 20B (e) (2). This presumption puts the creditor's original determination of fair market value, and thus the means or market selected by the creditor to sell the vehicle and establish the fair market value, to the test. It does so by using retail data readily available to debtors and creditors.

A presumption is an evidentiary tool that accepts a certain fact as proven in the absence of contradictory evidence. See Mass. G. Evid. § 301(d) (2018). A presumption "imposes on the party against whom it is directed the burden of production to rebut or meet that presumption." Id. "If that party fails to come forward with evidence to rebut or meet that presumption, the fact is to be taken by the fact finder as established." Id. If, however, that party introduces evidence that meets or rebuts the presumption, "the presumption shall have no further force or effect." Id. In effect, a presumption simply imposes a burden of production on a party as to some fact to be proved. See Mass. G. Evid. § 301(d) & note.

The estimated retail value of the vehicle thus has a very limited role in the statute. When the deficiency or the fair market value is disputed, there is a rebuttable presumption that the estimated retail value is fair market value. This presumption places the burden on the creditor to prove the fair

market value of the vehicle. The fair market value of the vehicle, however, is just that: the highest price that a willing buyer would pay Honda in a fair market for the vehicle. See Epstein, 317 Mass. at 299. And fair market value, not fair market retail value, is what the statute provides that the court must determine. The statute does not dictate use of a particular market. If contested, a court must determine the fair market value based on all the facts and circumstances, including the goods to be sold, the relevant markets, the particular creditors and debtors, and the rebuttable presumption. See generally Rapson, Deficient Treatment of Deficiency Claims: Gilmore Would Have Repented, 75 Wash. U. L.Q. 491, 522-523 (1997) (discussing different factors that go into consideration of fair market value). See also In re Roberts, 210 B.R. 325, 330-331 (N.D. Iowa 1997) (exclusive reliance on industry guides alone is disfavored and may contradict court's duty to value specific collateral at issue).

Indeed, if the Legislature had intended fair market value to be fair market retail value, it would have simply said so, as other provisions in the General Laws demonstrate that the Legislature is capable of specifying retail or wholesale markets and values in statutes when it intends to do so. See, e.g.,

G. L. c. 127, § 67 ("wholesale market price"); G. L. c. 159C,

§ 5A (a) ("retail market value of the goods or services").[4]

Our interpretation of the statutory language leads to the conclusion that fair market value, not fair market retail value, is to be used when calculating a deficiency under G. L. c. 255B, § 20B.

ii.  Legislative history.  The limited legislative history available supports the plain language interpretation of fair market value and does not even mention fair market retail value.[5]

---

[4] Other examples include G. L. c. 6, § 197 ("wholesale market price of such device prevailing at the time of sale"); G. L. c. 127, § 58 ("shall conform as nearly as may be to the wholesale market rates for similar goods"); and G. L. c. 64H, § 1 (referencing "retail sales market in the commonwealth" and "every person engaged in the making of retail sales at auction").

[5] The dissent accuses the court of largely ignoring the relevant legislative history in this case.  Post at    .  Quite the contrary, it is the dissent that only selectively references portions of the legislative history.  The dissent relies on the recommendation from the Consumers' Council (council), an executive agency that would propose multiple bills each legislative session, and this reliance is misplaced for several reasons.  First, the dissent's position that the council "first recommended for legislative action" the bill that the Legislature eventually enacted, see post at    -   , is simply wrong.  The council's recommendation recycled proposals from earlier legislative sessions, and the bill that eventually passed the House, see 1973 House Doc. No. 6884, was the product of at least three separate proposed bills that were being considered by the committee.  Id.  The dissent wholly ignores the three years of proposed legislation that preceded the council's recommendation, some of which contained provisions

The Legislature enacted the current provisions in G. L. c. 255B, §§ 20A and 20B, in 1973. St. 1973, c. 629. The Legislature began considering proposals to amend these provisions as early as 1970. See 1970 House Doc. No. 3814 ("An Act restricting deficiency judgments in motor vehicle installment sales"). From 1970 to 1973, the Legislature considered at least eight different bills to amend §§ 20A and 20B.[6]

There were at least five different proposals for how to calculate or limit deficiencies.[7] Most significantly, none of

---

that were eventually enacted. See note 6, infra (list of proposed legislation predating council's recommendation). Additionally, the council's proposal does not mention fair market value, fair market retail value, or even the rebuttable presumption of estimated retail value, the key language that the court is interpreting in this case. See 1973 House Doc. No. 66. Instead, the council's proposal contained a completely different mechanism for calculating deficiencies that does not involve fair market value or the estimated retail value. Therefore, the dissent's treatment of the council's recommendation as conclusive as to legislative intent, see post at    , is erroneous and misleading.

[6] See 1973 House Doc. No. 6884; 1973 House Doc. No. 66; 1972 House Doc. No. 6111; 1971 House Doc. No. 5470; 1971 House Doc. No. 2767; 1970 House Doc. No. 5533; 1970 House Doc. No. 4574; 1970 House Doc. No. 3814. Several additional bills filed during this period appear to be refilings of earlier proposals. See 1973 House Doc. No. 2833 (refiling of 1972 House Doc. No. 6111); 1972 House Doc. No. 2775 (refiling of 1971 House Doc. No. 5470).

[7] One bill proposed abolishing deficiencies altogether, limiting the creditor's recovery to the proceeds of the sale of

these prior proposals considered using the estimated retail value of the collateral.  At least one proposed bill, however, used the fair market value of the collateral without any reference to retail value.  See 1970 House Doc. No. 5533 ("buyer shall not be liable for any deficiency or part of a deficiency which results from a difference between the proceeds of the sale and the fair market value of the motor vehicle at the time of repossession or surrender").

The current method for calculating deficiencies in § 20B was not proposed in the Legislature until 1973.  See 1973 House Doc. No. 6884.  It appears that the Legislature took this approach from the National Consumer Act (NCA), a draft model act proposed by the National Consumer Law Center in 1970 that uses almost the same language as G. L. c. 255B, § 20B.  As the comments to the NCA suggest, this approach to calculating deficiencies is "the more equitable approach" that properly balances the concerns of creditors left with large unpaid

the collateral.  See 1971 House Doc. No. 2767.  Two separate bills proposed prohibiting a creditor from collecting a deficiency where the cash price of the collateral was below a certain amount.  See 1971 House Doc. No. 5470 (debtor not liable where cash price was equal to or less than $4,000); 1970 House Doc. No. 4574 (debtor not liable where cash price was equal to or less than $2,000).  Another proposal provided that the debtor would not be liable "for any deficiency or part of a deficiency which results from a difference between the proceeds of the sale and the fair market value of the collateral at the time of repossession or surrender."  1970 House Doc. No. 5533.

balances when a consumer defaults after purchase and the interest in shielding consumers from unnecessary or unnecessarily inflated deficiency claims. See NCA § 5.211 comment (1970). See also Rubin, Deficiency Judgments: A Louisiana Overview, 69 La. L. Rev. 783, 786 (2009) (rules regulating deficiencies balance interests of debtors, creditors, and public policy). The approach to calculating fair market value discussed <u>supra</u> preserves and protects that balance. Regardless, nothing in the legislative history imposes a fair market retail value standard.

iii. <u>Automobile repossession market</u>. Our interpretation of the statutory language and legislative history is also consistent with the practical realities of the automobile repossession market. As evidenced by an extensive study of the automobile repossession market by the Federal Trade Commission in the 1970s, creditors have an incentive to obtain the highest possible price for collateral that they repossess. Federal Trade Commission, Trade Regulation; Credit Practices; Final Rule, 49 Fed. Reg. 7740, 7783 (Mar. 1, 1984).[8] This study also concluded that using fair market retail value to calculate deficiencies "has several defects that make it completely impractical." See Federal Trade Commission, Report of the

---

[8] As discussed <u>supra</u>, G. L. c. 255B, § 20B, was enacted in 1973. See St. 1973, c. 629.

Presiding Officer on Proposed Trade Regulation Rule: Credit Practices, at 238 (1978) (FTC Report). The commercial realities of today's market, as described in the record, confirm both of these propositions.

Creditors generally do not sue to collect the deficiency. See FTC Report, supra at 220 ("Testimony and evidence presented by many witnesses at the hearings showed that deficiency judgments were not often sought and that recoveries of deficiencies did not provide creditors with a significant amount of revenue"). See also id. at 221-222 ("Creditor-repossessors on an average filed no more than one suit for every five cars repossessed . . ."); J.J. White & R.S. Summers, Uniform Commercial Code § 25-10, at 919 (4th ed. 1995) ("In many cases in which cars are repossessed and resold -- perhaps in the large majority -- no claim for deficiency is filed"). Indeed, Honda has filed lawsuits to collect the deficiencies fewer than five times over the past few years even though it sells tens of thousands of motor vehicles each year, of which approximately twenty to thirty per cent are repossessed vehicles. It is also unlikely that the creditor will recover much, if any, of the resulting deficiency. See National Consumer Law Center, Repossessions § 12.1.1 (9th ed. 2017) ("Creditors know they are able to collect only a small percentage of deficiency judgments"). The FTC found that creditors only collected

between five and fifteen per cent of these deficiencies. See 49

Fed. Reg. at 7783. In this case, the evidence suggests that

Honda has collected less than ten per cent of the deficiency

judgments that it does obtain.[9] These realities all incentivize

a creditor to maximize the sale price. Thus, for the creditor,

the repossession and disposition of the collateral is almost

always the last opportunity to minimize the loss caused by a

consumer defaulting. See Matter of Excello Press, Inc., 890

F.2d at 901 ("[W]hy would [a secured party] forgo a dollar today

for the chance to enforce a deficiency judgment tomorrow?").

There are also practical problems with imposing a retail

market price. In the motor vehicle industry, retail sales

require capital, facilities, and personnel, which creditors

often lack. FTC Report, supra at 229-231. Moreover, selling a

---

[9] The dissent's concern about, and heavy reliance upon, the "cooperative, perhaps unwitting, consumer," post at note 1, who would default on instalment payments but then pay the entire outstanding balance after repossession and sale but before the creditor sues to collect the debt, has absolutely no support in either this record or the extensive record considered by the Federal Trade Commission when it rejected a fair market retail value standard on policy grounds. See Federal Trade Commission, Trade Regulation; Credit Practices; Final Rule, 49 Fed. Reg. 7740, 7783 (Mar. 1, 1984). The record supports the exact opposite conclusion, that defaulting debtors who have had their automobiles repossessed do not "simply pay" the deficiency. See, e.g., id. (creditors on average collect five to fifteen per cent of deficiencies); National Consumer Law Center, Repossessions § 12.1.1 (9th ed. 2017) ("Creditors know they are able to collect only a small percentage of deficiency judgments").

repossessed motor vehicle at retail entails further costs, such as storage, overhead, and most importantly, reconditioning of the vehicle for sale at retail. Id. at 247 (noting "convincing evidence that many repossessed automobiles, and probably the overwhelming majority, require extensive reconditioning or repair to make them suitable for sale at retail"). As the FTC noted, when the creditors who repossess vehicles are retailers, they will usually sell the vehicle at retail. See 49 Fed. Reg. at 7784. When they are not retailers, however, the retail market may be neither practical nor fair.[10] Indeed, Honda is not

---

[10] The dissent's fair market retail value standard has been described, after exhaustive study, as "manifestly and patently unfair to creditors." Federal Trade Commission, Report of the Presiding Officer on Proposed Trade Regulation Rule: Credit Practices, at 239 (1978). The dissent nonetheless contends that the Legislature intended to impose this commercially unreasonable standard, a standard that has "no generally accepted meaning," id. at 237, and that is not mentioned anywhere in the General Laws or our case law. In an attempt to support this highly unusual standard, the dissent argues that the Legislature would not have gone from a commercially reasonable standard to a fair market value standard as described by the court, as the two standards are too similar in the dissent's view. Post at   -  . The dissent then goes further and misreads the court's decision as stating that the court has concluded that these two standards are the same. Id. at   . This is incorrect. We recognize that there is great overlap between "fair market value" and "commercially reasonable," but emphasize that there are meaningful differences between a commercially reasonable standard and a fair market value standard. For example, under the Uniform Commercial Code, the fact that a creditor could have obtained a higher price does not necessarily mean that a disposition was commercially unreasonable. See G. L. c. 106, § 9-627 (a). Under a fair market value standard, however, the creditor must obtain "the

licensed to sell on the retail market and may interfere with the legal rights of independent Honda dealers.

Finally, the fact that industry guides, such as the Black Book used by Honda, provide different estimated prices simply reflects the reality that consumers, wholesalers, and retailers each add varying amounts of value to the vehicle that are built into the different sale prices that each can obtain from consumers.  See Lawless & Ferris, Economics and the Rhetoric of Valuation, 5 J. Bankr. L. & Prac. 3, 5 (1995) ("The reasons for the price difference result from the manner in which the retail and wholesale automobile markets operate, not because the same automobile can have two different values").  For example, the difference between the estimated retail value of an automobile and the estimated wholesale value of an automobile is often a result of the costs of retailing.  See id. at 18 ("inflated retail price includes value-adding activities by the retailer").  See also FTC Report, supra at 230-231.

Imposing a fair market retail value on sales by all creditors would also appear to have unintended consequences.  It

---

highest price which a hypothetical willing buyer would pay to a hypothetical willing seller in an assumed free and open market" or credit the debtor with that amount.  Epstein v. Boston Hous. Auth., 317 Mass. 297, 299 (1944).  Regardless, reframing and refining a commercially reasonable standard to be a fair market value standard is quite different from imposing a commercially unreasonable standard, the approach recommended by the dissent.

would likely increase the cost of borrowing because many creditors lack the means, and some, like Honda, the legal right, to sell repossessed vehicles at retail. See 49 Fed. Reg. at 7784. In the end, these costs would invariably be passed on to all consumers. The result would likely be more expensive financing even for the vast majority of borrowers who pay off their vehicle loans.

In sum, the Legislature did not dictate a particular market and left the determination of fair market value to the courts in contested cases. The plain language of the statute, the legislative history, and the realities of the automobile repossession market all support this approach to the determination of fair market value.

b. Questions two and three. Questions two and three are closely related, as each asks whether the notice required by the Uniform Commercial Code can be sufficient even if it does not describe the debtor's deficiency as the difference between the outstanding balance and the fair market value of the collateral. Specifically, these questions ask:

"2. Whether, and in what circumstances, a pre-sale notice is 'sufficient' under [the Uniform Commercial Code, G. L. c. 106, § 9-614 (4) and (5)], and 'reasonable' under [the Uniform Commercial Code, G. L. c. 106, § 9-611 (b)], where the notice does not describe the consumer's deficiency liability as the difference between what the consumer owes and the 'fair market value' of the collateral, and the transaction is governed by [G. L. c. 255B]?

"3.  Whether, and in what circumstances, a post-sale deficiency explanation is 'sufficient' under [the Uniform Commercial Code, G. L. c. 106, § 9-616,] where the deficiency is not calculated based on the 'fair market value' of the collateral, and the transaction is governed by [G. L. c. 255B]?"

We conclude that the notice that is required by the Uniform Commercial Code is never sufficient where the deficiency is not calculated based on the fair market value of the collateral and the notice fails to accurately describe how the deficiency is calculated.

The Uniform Commercial Code provisions in G. L. c. 106, §§ 9-600, generally govern defaults in secured transactions. General Laws c. 106, § 9-614, requires that notice be given to a debtor prior to the disposition of repossessed collateral, and G. L. c. 106, § 9-616, requires that notice be provided after the collateral is sold.  Under each section, the notices must include certain information to be sufficient, including a description of any deficiency that the debtor will owe.  See G. L. c. 106, § 9-614 (1) (B); G. L. c. 106, § 9-616 (b) (1). The Uniform Commercial Code also provides standard form language, including the following statement for presale notices: "The money that we get from the sale (after paying our costs) will reduce the amount you owe.  If we get less money than you owe, you (will or will not, as applicable) still owe us the difference.  If we get more money than you owe, you will get the

extra money, unless we must pay it to someone else." G. L. c. 106, § 9-614 (3). A notification following the above form "is sufficient, even if additional information appears at the end of the form." G. L. c. 106, § 9-614 (4).

General Laws c. 255B, § 20B (d), provides that the Uniform Commercial Code applies "unless displaced by the provisions of [§ 20B] and [§ 20A]." General Laws c. 255B, § 20B, calculates the deficiency using the fair market value of the vehicle, whereas the Uniform Commercial Code calculates deficiencies using the proceeds of a "commercially reasonable" sale. See G. L. c. 106, § 9-615. Because the Uniform Commercial Code and G. L. c. 255B, § 20B, calculate deficiencies differently, the use of the Uniform Commercial Code safe harbor language is inconsistent with Massachusetts law. The notice that is required by G. L. c. 106, § 9-614, and G. L. c. 106, § 9-616, must describe the deficiency as the difference between the fair market value of the collateral and the debtor's outstanding balance because this is what is required by § 20B.

Therefore, when creditors are providing notice prior to disposing of the collateral under § 9-614 (3), the notice should include language similar to the following statement:

> "The fair market value of your vehicle will be used to reduce the amount you owe, which is your outstanding balance plus the reasonable costs of repossessing and selling the vehicle. If the fair market value of your vehicle is less than you owe, you (will or will not, as

applicable) still owe us the difference. If <u>the fair market value of your vehicle is more</u> than you owe, you will get the extra money, unless we must pay it to someone else." (Emphasis added.)

Additionally, when providing notice of the deficiency after the sale under § 9-616, the notice should clearly identify the fair market value of the vehicle in the calculation of the deficiency. This statement replaces the description of "the amount of proceeds of the disposition" that is currently required by § 9-616 (<u>c</u>) (2). Ultimately, the notice required by the Uniform Commercial Code will only be considered sufficient if it accurately describes the deficiency under G. L. c. 255B, § 20B.

3. <u>Conclusion</u>. In transactions governed by G. L. c. 255B, a debtor's deficiency liability must be calculated as the difference between the debtor's unpaid balance and the fair market value of the repossessed collateral. In determining fair market value, the Legislature did not dictate the creditor's market choice in the first instance and left the ultimate determination of fair market value to the courts in contested cases, taking into account both creditor and debtor interests, the means, methods, and markets used to sell the vehicle, and a rebuttable presumption of estimated retail value as provided in periodically published trade journals to put the market choice and valuation of the creditor to the test. In presale notices

and postsale deficiency explanations, creditors must describe and calculate the debtor's deficiency as based on "the fair market value" of the vehicle.

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States Court of Appeals for the First Circuit, as the answers to the questions certified, and will also transmit a copy to each party.

GANTS, C.J. (dissenting).  I respectfully dissent.

Most American consumers purchase their motor vehicles on credit, in many cases by entering into a retail instalment contract.  See Federal Reserve, Report on the Economic Well-Being of U.S. Households in 2015, at 42 (2016).  Under a typical retail instalment contract, the consumer makes an initial down payment and promises to pay the remainder of the purchase price, plus interest and fees, in regular instalments.  The consumer can keep the vehicle as long as he or she continues to make these payments or otherwise repays the loan in full; if the consumer falls behind on payments or stops making them, the creditor can repossess the vehicle and sell it to satisfy the unpaid debt.  If, after the vehicle is sold, some part of the debt remains unpaid, the consumer may be liable for that deficiency.

In Massachusetts, this process of repossession and sale is governed by the Retail Instalment Sales of Motor Vehicles Act (act), G. L. c. 255B, §§ 20A and 20B, and the Uniform Commercial Code (UCC), G. L. c. 106, §§ 9-601 to 9-628.  Under § 20B of the act, a creditor who repossesses and sells a vehicle may be entitled to recover from the consumer the deficiency, if any, that remains after deducting the "fair market value" of the vehicle from the consumer's unpaid balance.  G. L. c. 255B, § 20B (e) (1).  Section 20B also establishes a presumption, in

deficiency proceedings, that trade estimates of retail value -- such as those found in the Black Book -- reflect the vehicle's "fair market value."  G. L. c. 255B, § 20B (e) (2).

Based on this presumption, and on the commercial realities that underlie this statute, as well as its purpose and legislative history, I would hold that the "fair market value" of a vehicle under § 20B is the fair market retail value of that vehicle.  The court, however, concludes that the term "fair market value" in § 20B does not necessarily mean retail value, and that it is only presumed to have that meaning when a creditor sues a consumer for a deficiency.  See ante at   .  I do not agree with this interpretation for three reasons.

First, the court's interpretation of § 20B disregards the commercial realities of the motor vehicle market.  The United States Court of Appeals for the First Circuit has asked us "[w]hether the 'fair market value' of collateral under [G. L. c. 255B, § 20B,] is the fair market retail value of that collateral," recognizing that, in the motor vehicle market, prices hinge on whether the vehicle is sold at wholesale or at retail.  Here, for example, at the time that the plaintiff's vehicle was sold, the Black Book listed the wholesale value for a comparable vehicle as $7,750, and its retail value as $9,800.  In response, the court answers that "fair market value" means fair market value.  Ante at   .  This is not a helpful answer

to the First Circuit's reported question.  Nor will it aid a judge or jury asked to determine the amount of a deficiency at trial.  It is hardly helpful to recite the classic definition of "fair market value," stating that it is the "highest price that a willing buyer would pay . . . in a fair market for the vehicle," when that price will depend on whether that willing buyer is a wholesale dealer or a retail consumer.  Ante at   .  And the court's additional guidance -- that "[i]f contested, a court must determine the fair market value based on all the facts and circumstances, including the goods to be sold, the relevant markets, the particular creditors and debtors, and the rebuttable presumption" -- will not be any more illuminating to a judge or jury.  Id.

The Legislature recognized the commercial realities of the motor vehicle market when it established a presumption in § 20B (e) (2), providing that in deficiency proceedings, "[p]eriodically published trade estimates of the retail value of goods shall . . . be presumed to be the fair market value of the collateral" (emphasis added).  Consequently, where the creditor sues the consumer because he or she has failed to pay a deficiency, the presumptive fair market value of the vehicle is the retail value listed in trade estimates, such as those found in the Black Book.  And in the absence of other evidence rebutting that presumptive value, the deficiency judgment must

deduct this retail value from the unpaid balance.  See Epstein v. Boston Hous. Auth., 317 Mass. 297, 302-303 (1944) (where presumption is unrebutted, it "retain[s] its force as a rule of law requiring the judge" to apply presumption).  See also 9 J.H. Wigmore, Evidence § 2487(c), at 295 (Chadbourn rev. ed. 1981) ("[A] presumption creates for the opponent a duty of producing evidence, in default of which he loses as a matter of legal ruling").

Where the Legislature has established trade estimates of retail value as the presumed fair market value of the collateral in a deficiency proceeding, I believe it must have intended that "fair market value" be the retail value.  Indeed, if the Legislature had intended the term "fair market value" to mean something other than retail value, it would make no sense -- given that trade estimates typically include retail, wholesale, and trade-in values -- to choose trade estimates of retail value as a presumptive starting point.  National Consumer Law Center, Repossessions § 10.9.5.1, at 341-342 (9th ed. 2017).  To be sure, the presumption in § 20B (e) (2) is rebuttable, but only with evidence that the trade estimates do not reflect the collateral's actual fair market retail value, for example, because the condition of the vehicle is especially poor.  The creditor can provide an alternative measure of retail value, but

the ultimate value to be determined must still be the fair market retail value.

The court takes the position that § 20B "does not dictate use of a particular market" and that the term "fair market value" need not categorically refer to either wholesale or retail value. Ante at    . I agree with the court that the determination of actual fair market value in any given deficiency proceeding will depend on the specific facts. Ante at    . But the meaning of the term itself is a legal question, which the First Circuit has asked us to resolve. See Wright vs. United States, U.S. Ct. App., Nos. 90-5089 & 90-5096 (Fed. Cir. Feb. 12, 1991) ("How fair market value is defined is a legal question; what constitutes fair market value in a particular case is a factual matter"). "[F]air market value is . . . to be determined [not] in a rarefied realm of abstract calculation, but from the perspective of a hypothetical buyer in the real world," Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land, 195 F. Supp. 2d 314, 321 (D. Mass. 2002), and in the real world, the value of a vehicle typically depends -- as we can see from the Black Book and other trade manuals -- on whether it is sold in a wholesale market or in a retail market.

Second, the court's interpretation of § 20B would have practical results that I am confident the Legislature did not intend. Under the court's reading, a consumer's deficiency is

presumed to be based on retail value only at a deficiency proceeding, but not where the consumer decides to voluntarily pay the deficiency.  Not only does this interpretation create a significant difference between the amount the creditor could demand from the consumer and the amount it would likely be awarded at a deficiency proceeding in a court of law, but it would also provide an incentive for a consumer to refuse to pay a deficiency, knowing that the creditor would likely be entitled to receive less at a deficiency proceeding.[1]  I do not believe that in enacting this presumption the Legislature intended to penalize consumers who pay their debts and reward those who do not.  See Attorney Gen. v. School Comm. of Essex, 387 Mass. 326, 336 (1982) ("We assume the Legislature intended to act reasonably").

---

[1] To illustrate the practical results of the court's interpretation, consider this example:  if a consumer's vehicle is repossessed because of an unpaid balance of $20,000, and is sold at an auction for $8,000 when its estimated Black Book retail value is $10,000, under this reading the creditor could demand a deficiency of $12,000.  The cooperative, perhaps unwitting, consumer would simply pay the $12,000.  The uncooperative, perhaps more savvy, consumer who refuses to pay may be sued by the creditor for the deficiency, but in such a lawsuit he or she would benefit from the statutory presumption of the estimated Black Book retail value and, unless that presumption was rebutted by the creditor, would be ordered to pay only $10,000 in a deficiency judgment.  Thus, a consumer who just pays the deficiency when asked will likely pay more than a consumer who waits to be sued.

Third, the court's interpretation is at odds with the purpose and history of the act. In order to ascertain the meaning of § 20B (e), it is crucial to understand the statutory scheme that it replaced and the reasons behind this change. Because the court has largely ignored this history, I summarize it here.

The predecessor to the current § 20B of the act was first enacted in 1966, together with an amended § 20A. St. 1966, c. 284, § 3. As originally enacted, these twin provisions gave creditors wide latitude in the repossession and sale of vehicles purchased under retail instalment contracts. Notice of the intent to repossess was not required: a creditor could either notify the consumer fourteen days before repossessing, in which case the creditor was entitled to the reasonable costs of repossession, storage, and sale, or it could simply repossess without prior notice, in which case it would forgo recovery of those costs. See former G. L. c. 255B, § 20A (A), (C) (1)-(2), inserted by St. 1966, c. 284, § 3. Following repossession, the consumer could redeem the collateral only by paying the full amount due under the contract. See former G. L. c. 255B, § 20B (B)-(C), inserted by St. 1966, c. 284, § 3. If the consumer failed to redeem, and the collateral was sold, the act contemplated that the consumer would be liable for any deficiency, see former G. L. c. 255B, § 20A (D), inserted by

St. 1966, c. 284, § 3, but was silent as to how that deficiency would be calculated. As a result, the background rules of the Uniform Commercial Code (UCC) applied, and the creditor could claim a deficiency equal to the difference between the outstanding loan balance and the sale proceeds as long as the sale was "commercially reasonable." See former G. L. c. 106, § 9-504 (1)-(3), inserted by St. 1957, c. 765, § 1. See generally Queenan, The New Consumer Repossession Law, 58 Mass. L. Q. 412, 416-417 (1973) (Queenan).

Sections 20A and 20B were substantially amended in 1973, see St. 1973, c. 629, § 2, at a time when public concern over abusive consumer credit practices was mounting. Consumer instalment credit had swelled nationwide, more than doubling from $42 billion outstanding in 1960 to $102 billion in 1970. Federal Reserve, Financial and Business Statistics, 59 Fed. Res. Bull. A56 (1973). Consumers in 1970 shouldered more than $35 billion of debt in order to finance the purchase of motor vehicles -- more than one-half of the vehicles purchased in the United States were purchased on credit -- and another $31 billion for other consumer goods. See id.; United States Bureau of the Census, Statistical Abstract of the United States 549 (94th ed. 1973). When consumers defaulted on these loans, creditors had a broad range of remedies to choose from, including repossession of the collateral and lawsuits for

deficiency, which typically resulted in default judgments against consumers because of their failure to appear. See National Commission on Consumer Finance, Consumer Credit in the United States 23-42 (1972). Some creditors engaged in especially aggressive repossession tactics, seizing collateral in the middle of the night or under false pretenses. See, e.g., Whaley v. United States, 324 F.2d 356, 356-357 (9th Cir. 1963), cert. denied, 376 U.S. 911 (1964) (private repossessor impersonated Federal law enforcement agent); Boland v. Essex County Bank & Trust Co., 361 F. Supp. 917, 921 (D. Mass. 1973) (repossessions involved "stealthful reclamation of motor vehicles during the nighttime"). See also Firmin & Simpson, Business As Usual: An Empirical Study of Automobile Deficiency Judgment Suits in the District of Columbia, 3 Conn. L. Rev. 511, 512 & n.5 (1971) (Firmin & Simpson) (in study of 106 motor vehicle deficiency suits in District of Columbia courts, ninety-five per cent of repossessions were carried out between midnight and 6 A.M.).

With the rapid growth of consumer credit, various efforts were undertaken to protect consumers from overreaching creditors. In a pair of landmark decisions, the United States Supreme Court took substantial steps to limit creditors' remedies, holding that creditors could not, absent notice or a hearing, enforce debts by garnishing debtors' wages, Sniadach v.

Family Fin. Corp. of Bay View, 395 U.S. 337, 342 (1969), or by seizing collateral under a writ of replevin, Fuentes v. Shevin, 407 U.S. 67, 96 (1972). See Clark & Landers, Sniadach, Fuentes and Beyond: The Creditor Meets the Constitution, 59 Va. L. Rev. 355, 355-362 (1973). Meanwhile, the Federal Trade Commission (FTC) in 1973 launched a two-year investigation into the consumer credit industry, during which it identified several patterns of abusive practices. See Federal Trade Commission, Annual Report 29 (1974). In particular, the FTC found that "many creditors abuse the deficiency judgment mechanism by selling repossessed goods at prices substantially below their fair market retail value." 40 Fed. Reg. 16,347, 16,348 (1975). The FTC's findings were consistent with several empirical studies from the time, which indicated that repossessed motor vehicles were sold for little more than one-half of their retail value.[2] Although creditors attributed these low resale values to

---

[2] Researchers in three separate studies concluded that repossessed motor vehicles were sold, on average, for only fifty to sixty-five per cent of their retail value, as listed in trade manuals. See Note, I Can Get It for You Wholesale: The Lingering Problem of Automobile Deficiency Judgments, 27 Stan. L. Rev. 1081, 1084-1085 (1975) (study of 216 motor vehicle deficiency suits filed in Alameda County, California); Firmin & Simpson, Business As Usual: An Empirical Study of Automobile Deficiency Judgment Suits in the District of Columbia, 3 Conn. L. Rev. 511, 512, 518 (1971) (study of 106 motor vehicle deficiency suits filed in the District of Columbia); Schuman, Profit on Default: An Archival Study of Automobile Repossession

the poor condition of repossessed vehicles -- as well as to the fact that many creditors lacked the facilities or resources to sell directly to the retail market -- consumer advocates claimed that creditors profited from the practice. See Federal Trade Commission, Report of the Presiding Officer on Proposed Trade Regulation Rule: Credit Practices 224-237 (1978). Some dealers and finance companies were believed to engage in the practice of "churning" vehicles, whereby the same vehicle would be repossessed, sold at a low price to the original dealer, sold again at a higher price to another consumer, then repossessed again upon default, and so on, repeating the process of repossession and sale several times, with hefty deficiency judgments obtained against each new defaulting consumer.[3] See id. at 233-234. See also Firmin & Simpson, supra at 517-518

---

and Resale, 22 Stan. L. Rev. 20, 31 (1969) (study of eighty-three motor vehicle deficiency suits filed in Connecticut).

[3] To give an example of how the "churning" process works, suppose a consumer purchases a motor vehicle from a dealer for $30,000, financing the full amount through a retail instalment contract. The dealer then assigns that contract to an affiliated finance company. When the consumer defaults, her unpaid balance is $20,000. The finance company repossesses the vehicle and sells it back to the dealer for $15,000, then sues the consumer, recovering a deficiency of $5,000. Meanwhile, the dealer sells that same vehicle to another consumer for $25,000. As a result, the finance company is made whole, having received the $15,000 in sale proceeds and a $5,000 deficiency judgment, in full satisfaction of the debt, while its affiliated dealer makes a $10,000 profit, having purchased the vehicle at wholesale for $15,000 and sold it at retail for $25,000. This process can be repeated several times with the same vehicle.

(creditors who engaged in "churning" were found to sell and finance same vehicle at least three times).

Against this background, the Massachusetts Legislature in 1973 undertook to strengthen the rights of consumers in consumer credit transactions. "An Act relative to taking possession of collateral and deficiency judgments," St. 1973, c. 629, was first recommended for legislative action by the Massachusetts Consumers' Council (council), an independent agency charged with acting as a public advocate for consumer interests. See St. 1963, c. 773. As the council explained in its recommendation, "[the] proposed legislation" was intended to "clarify and secure a debtor's rights." 1973 House Doc. No. 59. Specifically, the council stated that "[the] proposed bill," by limiting creditors' rights to repossess collateral and recover deficiencies from consumers, "will stop the practice of constant sale, repossession, deficiency judgment, resale, etc., now engaged in by some unscrupulous merchants, and will greatly enhance the protection afforded the unsuspecting consumer." Id.[4]

---

[4] The original version of the 1973 legislation proposed by the Massachusetts Consumers' Council (council) would have required a judicial determination before a creditor could repossess collateral and would have also eliminated the consumer's deficiency liability where the "cash price" of the repossessed collateral was $4,000 or less. See 1973 House Doc. No. 59; 1973 House Doc. No. 66, § 4. It was an amended version of the council's proposed bill, based also on two other bills on the same topic, which was subsequently enacted without

As eventually enacted, the 1973 legislation "impose[d] substantially greater restrictions on the rights of secured creditors in consumer credit transactions," amending not only the laws governing motor vehicle retail instalment sales, G. L. c. 255B, §§ 20A and 20B, but also the laws governing loans secured by consumer goods, G. L. c. 255, §§ 13I and 13J, and other retail instalment sales and services, G. L. c. 255D, §§ 21 and 22. Queenan, supra at 412.

The 1973 legislation amended §§ 20A and 20B of the act to benefit consumers in five significant ways. First, it strengthened notice requirements. Section 20A, as amended, no longer gives creditors a choice whether to notify consumers before repossession; rather, it provides that a creditor cannot take possession of a vehicle unless the creditor gives the consumer notice, in writing, conspicuously stating the consumer's rights upon default, including the right to redeem the collateral after repossession. G. L. c. 255B, § 20A (b)-(c). Second, the 1973 legislation limited the remedies available to creditors in the event of default. Section 20A now provides that, after giving notice of the intent to repossess, a creditor must wait at least twenty-one days before repossessing the vehicle or bringing an action against the consumer. G. L.

_____

substantial change. See 1973 House Doc. No. 6884; St. 1973, c. 629.

c. 255B, § 20A (d).  During that period, a creditor also may not accelerate the debt; thus, whereas previously a consumer could cure the default only by paying the full debt, under the amended § 20A, a consumer need only make the overdue payments to cure the default and avoid repossession.  G. L. c. 255B, § 20A (d)-(e).  Third, § 20B now limits creditors' right to repossess, allowing repossessions without a prior hearing only where they can be carried out "without use of force [or] breach of peace," and, if repossession requires entry onto the consumer's property, only with the consumer's consent.  G. L. c. 255B, § 20B (a).  Fourth, the amended § 20B extends from fifteen to twenty days the period during which the consumer may redeem the collateral after repossession.  Compare G. L. c. 255B, § 20B (c), with former G. L. c. 255B, § 20B (A), inserted by St. 1966, c. 284, § 3.

Fifth, and of most relevance here, the 1973 legislation significantly narrowed the scope of consumers' deficiency liability.  Although under the UCC a consumer would have been liable for any deficiency following a "commercially reasonable" sale of the collateral, see former G. L. c. 106, § 9-504 (2)-(3), inserted by St. 1957, c. 765, § 1, § 20B was amended to provide that a consumer whose unpaid balance is $2,000 or less cannot be held liable for any deficiency.  G. L. c. 255B, § 20B (d).  Section 20B was also amended to change the rules for

calculating a consumer's deficiency.  Whereas under the UCC, the consumer's deficiency would have been the difference between the unpaid balance and the proceeds from a "commercially reasonable" sale, see former G. L. c. 106, § 9-504 (1)-(2), inserted by St. 1957, c. 765, § 1, § 20B now specifically states that the deficiency is the difference between the unpaid balance and "the fair market value of the collateral."  G. L. c. 255B, § 20B (e) (1).

It is evident from the statutory evolution of § 20B, as well as its legislative history and historical context, that it was intended broadly to protect the rights of consumers and, more specifically, to protect consumers from potential abuse by creditors who would repossess their vehicles, sell them at distressed prices, and then claim large deficiencies. Consistent with this legislative purpose, the term "fair market value" in § 20B (e) (1) must be read to mean the fair market retail value of the vehicle.  Calculating a consumer's deficiency based on retail value, rather than auction proceeds, diminishes the risk of abuse and specifically the risk of "churning," not only because it incentivizes creditors to sell the repossessed vehicle for the highest possible price, but also because -- in cases where the creditor fails to do so -- it

places the cost of that failure on the creditor, shielding consumers from excessive deficiency claims.[5]

It is also evident that, in making these amendments, the Legislature intended to displace the UCC provisions governing deficiency liability. Any doubt on this issue was resolved in 2001, when the Legislature made explicit that it intended to displace the UCC in this respect, adding to § 20B the language, "[n]otwithstanding the provisions of [UCC, G. L. c. 106, §§ 9-601 to 9-628]." St. 2001, c. 26, § 48. The court appears to adopt Honda's view that § 20B (e) (1) must be read together with the UCC, and that the term "fair market value" refers to the proceeds of a "commercially reasonable" sale, citing Matter of Excello Press, Inc., 890 F.2d 896, 904-905 (7th Cir. 1989), for the proposition that "[t]he product of a commercially reasonable sale is the fair market value." Ante at    .[6] But if the

---

[5] The court takes issue with my reading of the legislative history of § 20B, claiming that it "selectively references portions of the legislative history," that is, the proposal from the council and its accompanying recommendation. Ante at note 5. See 1973 House Doc. No. 59; 1973 House Doc. No. 66. The court is correct that by 1973 the Legislature had considered several different proposals on the issue of consumer deficiencies, and that none of the proposed bills -- including the council's proposal -- referenced retail value. Ante at note 5. And I do not claim otherwise. See note 4, supra. I rely on the council's proposal only to the extent that, in its accompanying recommendation, it sheds light on the consumer protection concerns that motivated the amendments.

[6] In addition, the court declares that "[t]he fair market value of the vehicle . . . is just that: the highest price that

Legislature had intended a consumer's deficiency to be calculated based on the proceeds of a "commercially reasonable" sale, as was already the case under the UCC, why would it have bothered to enact § 20B (e) (1) at all?  The court offers no explanation for why the Legislature would have enacted this provision if it intended only to preserve the status quo, or why it chose to use the term "fair market value," rather than keep the "commercially reasonable" language already found in the UCC, G. L. c. 106, § 9-610, if, in practice, it meant the same thing. The court's failure to do so is especially perplexing given that it later acknowledges, in its answer to the First Circuit's second and third questions, that the two standards are not the same.  Ante at     ("the Uniform Commercial Code and G. L. c. 255B, § 20B, calculate deficiencies differently").

Unsurprisingly, the court's interpretation of § 20B (e) (1) is also at odds with contemporary understandings of the statute when it was amended in 1973.  James F. Queenan, Jr., a commercial law practitioner and later a United States Bankruptcy

---

a willing buyer would pay Honda in a fair market for the vehicle" (emphasis added).  Ante at    .  But, as the court has emphasized, Honda sells all its repossessed vehicles at auction and does not have access to the retail market.  Ante at    .  In declaring that the fair market value of the vehicle is the highest price paid to Honda, then, the court implicitly declares that the fair market value is the wholesale value that Honda obtains at auction, as long as the auction is commercially reasonable.

Court judge, summarized the 1973 amendments to §§ 20A and 20B immediately after their approval, writing:

> "Under the Uniform Commercial Code a secured party may claim a deficiency based upon the proceeds of the resale less expenses so long as the resale is 'commercially reasonable.' Now as to consumer goods the amount of the deficiency is computed solely with reference to the 'fair market value of the collateral' less 'reasonable repossession and storage costs.' . . . <u>No longer will a secured party be entitled to rely on the wholesale price in computing his deficiency</u>." (Emphasis added; footnote omitted.)

Queenan, <u>supra</u> at 417.

In support of its interpretation, the court contends that, because creditors do not generally sue for deficiencies, and are unlikely to recover them even if they do, Honda and other creditors already have every incentive to obtain the highest possible price for repossessed vehicles. <u>Ante</u> at   -  . The court also contends that many creditors lack access to the retail market and therefore, as a practical matter, cannot obtain a price approximating retail value. <u>Id</u>. at   . As an empirical matter, this may very well be true. But legally, it is irrelevant. To interpret the meaning of § 20B (<u>e</u>) (1), this court need not evaluate the auction methods of Honda or any other creditor. We need not inquire into the creditors' incentives, or seek to ascertain the incidence of deficiency suits or the subsequent likelihood of recovery. <u>Ante</u> at   - . All that we have been asked to determine is what the

Legislature intended in 1973, and in 1973 the Legislature enacted § 20B to protect "unsuspecting consumer[s]" from "unscrupulous merchants" engaged in "the practice of constant sale, repossession, deficiency judgment, [and] resale," 1973 House Doc. No. 59, in the belief that crediting the consumer with the fair market retail value of the vehicle was the fair way to accomplish that goal.

Finally, the court also warns that, if deficiencies are calculated based on fair market retail value, the costs of borrowing would rise and "[i]n the end, these costs would invariably be passed on to all consumers." Ante at    .  Even if it were this court's task to determine whether this is the case -- and it is not -- I am skeptical that this would be the "invariable" consequence.  If, as the court states, "the repossession and disposition of the collateral is almost always the last opportunity" for a creditor to recover a debt after default, and creditors therefore have no real expectation of recovering the deficiency, ante at    , then it should not matter much to creditors, when setting their interest rates, how deficiencies are calculated.  If deficiencies are rarely paid, then reducing the amount of those deficiencies by the fair market retail value of the vehicle would have little or no impact on the interest rates that a creditor would charge for a motor vehicle loan.

Consistent with the commercial realities underlying § 20B, and with its purpose and history, I would hold that a consumer's deficiency liability must be calculated as the difference between the consumer's unpaid balance and the fair market retail value of the vehicle.  Accordingly, I would also hold that in their presale and postsale deficiency explanations, creditors must describe and calculate the consumer's deficiency liability as such.  I would therefore answer "Yes" in response to the first certified question, and "Never" to the second and third certified questions.