SUPERIOR COURT 
 
 COMMONWEALTH v. CREDIT ACCEPTANCE CORPORATION

 
 Docket:
 2084CV01954-BLS2
 
 
 Dates:
 March 15, 2021
 
 
 Present:
 Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER ON PARTIAL CROSS-MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT
 
 

 
            Credit Acceptance Corporation makes high-interest loans to high-risk car buyers. The Commonwealth claims that CAC made unfair or deceptive loans to Massachusetts consumers, engaged in unfair acts or practices in trying to collect on loans and repossess vehicles, and sold bundles of car loans to Massachusetts investors based on false or misleading statements.
            CAC’s business model is to work through automobile dealers rather than transact directly with car buyers. The dealer and customer agree on a purchase price for the vehicle, how much the buyer will pay up front, and what balance they will pay over time. The dealer submits the buyer’s application to borrow that balance to CAC, through an automated system that sets the loan terms and generates a loan contract, required disclosures, and related documents. The loan contract is between the dealer and the customer. As soon as those parties execute the contract, however, the dealer assigns it to CAC, which pays the dealer an agreed-upon percentage of the loan amount up-front or over time. CAC administers the contract and collects amounts due from the consumer.  If the consumer defaults then CAC may repossess and sell the vehicle.
            CAC has moved to dismiss  four  of  the  Commonwealth’s  seven  claims.  The Commonwealth has moved for partial summary judgment as to liability on three claims. The Court rules as follows on these motions.

 Count Two: The Commonwealth has standing to sue CAC for allegedly violating a state regulation that limits the frequency of telephone calls by creditors to collect a debt. The regulation does not violate the Free Speech clause of the First Amendment to the United States Constitution. Nor is the regulation so vague that enforcing it would violate the constitutionalrequirementsofdueprocess.But the merits of the claim turn on conflicting expert opinions and thus cannot be resolved on summary judgment.
  
                                                             -1-
  
 
 Counts Three and Four: The Court will deny CAC’s motion to dismiss the claim that sent notices about repossession that violated the Uniform Commercial Code; the Commonwealth has standing to assert this claim, and the alleged violation of G.L c. 255B can give rise to liability enforceable under the UCC. Since the summary judgment record proves that CAC sent unlawful, misleading notices, the Court will allow the Commonwealth’s request for summary judgment as to liability under the UCC and under G.L. c. 93A.
 Counts Five and Six: The Court will deny CAC’s motion to dismiss the two claims that CAC effectively charged and failed to disclose usurious interest rates. The complaint plausibly suggests that dealers increased the interest rate on car loans by hiking up purchase prices for higher-risk buyers and requiring buyers to enter into vehicle service contracts (“VSCs”) as a condition of obtaining a CAC loan. The Commonwealth states viable claims that CAC may be: (i) directly liable for failing to disclose the true effective finance charge; (ii) liable, at least for equitable remedies, as assignee of a loan charging a usurious interest rate; and (iii) vicarious liable with respect to the VSC claim, as the complaint plausibly suggests that dealers were acting as CAC’s agent in selling VSCs.
 Count Seven: Finally, the Court will deny CAC’s motion to dismiss the claim that it violated c. 93A by offering and selling securitized car loans based on deceptive statements. The Commonwealth has stated a viable claim. The complaint plausibly alleges that the challenged statements were false because they misrepresented CAC’s actual intentions regarding the credit characteristics of the loans that it would add to a particular note after the closing date. Whether the alleged misrepresentations were material cannot be resolved on a motion to dismiss.
             1. Excessive Phone Calls Claim—Summary Judgment. The Commonwealth seeks partial summary judgment as to liability on count two, which alleges that CAC committed unfair acts by making unlawfully frequent contacts with borrowers by telephone. Communications with a debtor are unfair if they are undertaken “with unreasonable frequency.” G.L. c. 93, § 49(c). Creditors may not initiate more than two telephone communications with a debtor during any seven day period. See 940 C.M.R. § 7.04(1)(f). This Call Regulation applies
  
                                                             -2-
  
 “whether the telephonic message is live, via text message, or via recorded audio message.” Armata v. Target Corp., 480 Mass. 14, 20 (2018). It therefore “applies to any attempted telephonic communication by a creditor to a debtor in an effort to collect a debt, so long as … the creditor is able to reach the debtor or to leave a voicemail message for the debtor.” Id. at 15–16. A violation of § 7.04(1)(f) will constitute a violation of G.L. c. 93A. See 940 C.M.R. § 3.16(3).
             1.1. Standing. CAC contends that the Attorney General lacks standing to sue CAC for past alleged violations of the Call Regulation because CAC is now in full compliance with this regulation and there is no evidence that any consumer “experienced an ascertainable loss” from being called too often. These arguments are without merit.
             If a company stops engaging in unfair or deceptive acts or practices in violation of c. 93A, the Attorney General may still pursue an enforcement action seeking injunctive relief against any further violation. See Lowell Gas Co. v. Attorney General, 377 Mass. 37, 47 (1979). Though the complaint in this case does not specifically request injunctive relief for CAC’s alleged violation of the Call Regulation, that does not bar the Commonwealth from obtaining such relief if it prevails on count two. See Mass. R. Civ. P. 54(c) (“every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings”); Marine Midland Bank v. Herriott, 10 Mass. App. Ct. 743, 745–746 (1980) (affirming grant of equitable relief not requested in complaint).
             And the Attorney General may enforce c. 93A without having to allege, prove, or quantify any economic injury. She may obtain civil penalties against someone who engages in an unfair or deceptive act or practice in trade or commerce that they “knew or should have known” violated the statute, and higher penalties if the violation was “willful.” See G.L. c. 93A, § 4. The Attorney General is not required to allege or prove that any individual consumer suffered some compensable injury as a result of the claimed violation. See Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 312 (1991); Commonwealth v. Chatham Development Co., Inc., 49 Mass. App. Ct. 525, 528-529, rev. denied, 432 Mass. 1107 (2000).
             1.2. First Amendment Challenge. As a further defense to count two, CAC also asserts that the Call Regulation violates the First Amendment to the United States Constitution. This argument is unavailing.
  
                                                             -3-
  
             1.2.1. Pending Federal Action. The Court will address the merits of this First Amendment defense, rather than await a decision in a pending federal action brought by CAC. Before filing this lawsuit, the Commonwealth had to give CAC at least five-days’ advance notice. See G.L. c. 93A, § 4, 2d para. When it did so, and before the Commonwealth could file this action, CAC raced to federal court and brought suit claiming that the Call Regulation is unconstitutional and therefore unenforceable. The Commonwealth filed this action seven days later.
             CAC argues that the Court should stay any action on count two until the pending federal action is resolved. In the exercise of its discretion, the Court declines to do so.
             Although the principle that CAC relies upon is often referred to as the first- filed or first-to-file “rule,” a court has discretion whether to apply it in any particular case. See Exxon Mobil Corp. v. Attorney General, 479 Mass. 312, 328 (2018), cert. denied sub nom. Exxon Mobil Corp. v. Healey, 139 S. Ct. 794 (2019). “Exceptions to the rule are not rare,” and a judge “has discretion to give preference to a later-filed action when that action will better serve the interests involved.” Id., quoting EMC Corp. v. Parallel Iron, LLC, 914 F. Supp. 2d 125, 127 (D.Mass. 2012) (Saylor, J.).
             When entirely duplicative lawsuits are filed in different jurisdictions at materially different times, the later-filed action is usually stayed pending final resolution of the first-filed action. See, e.g., TPM Holdings, Inc. v. Intra-Gold Industries, Inc., 91 F.3d 1, 4 (1st Cir. 1996). However, the filing of a complaint in Federal court just a few days before a State court filing “hardly triggers a mechanical application of the first-filed rule.” Exxon Mobil, 479 Mass. at 329.
             When, as in this case, “there is only a partial overlap in the subject matter of two actions, a judge has considerable discretion when deciding whether to grant a stay.” Id. at 329–330. Relevant considerations include “the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute.” TPM Holdings, supra. In the Court’s view, these considerations weigh against staying consideration of the Commonwealth’s claim under the Call Regulation.
             Here, the overlap between the federal action and this case is quite limited. In its Federal action, CAC seeks a declaratory judgment that the Call Regulation is unconstitutional and an injunction barring its enforcement. The federal action
  
                                                             -4-
  
 thus concerns only one issue raised by count two of the Commonwealth’s complaint in this case, and has nothing to do with the six other claims asserted here. Even with respect to count two, the Federal action does not raise and cannot resolve whether the Attorney General has standing to bring the claim or, if the regulation is constitutional, whether the Commonwealth can prove that CAC violated the limits it sets on contacting debtors.
             There is not a great risk of conflicting decisions if the Court were to reach the merits of CAC’s constitutional argument. The Federal court has not addressed the merits of CAC’s request to enjoin enforcement of the regulation on First Amendment grounds and may never do so. The parties report that the Commonwealth moved in September 2020 to dismiss the Federal action as barred by the Younger abstention doctrine,[1] and that no action has yet been taken on that motion. In any case, “the Court need not be concerned about inconsistent judgments here because the doctrine of res judicata can be employed if one court renders a judgment before the other.” Provanzano v. Parker, 796 F. Supp. 2d 247, 257 (D.Mass. 2011) (Gorton, J.) (cited with approval in Exxon Mobil, supra).
             The Federal court has no comparative advantage in resolving a First Amendment challenge to a Massachusetts regulation. “State courts are adequate forums for the vindication of federal rights;” this is “a foundational principle of our federal system.” Burt v. Titlow, 134 S. Ct. 10, 15 (2013). That principle applies with full force to First Amendment claims, which can be fairly and ably resolved in State courts. See Ohio Civil Rights Comm’n v. Dayton Christian Schools, Inc., 477 U.S. 619, 629 (1986) (Younger abstention doctrine
  
 ---------------------------
  
 [1]Under Younger v. Harris, 401 U.S. 37, 45–47 (1971), “federal courts are  [generally] required to abstain from enjoining ongoing state court proceedings … ‘if (1) there is an ongoing state judicial proceeding involving the federal plaintiff that (2) implicates important state interests and (3) provides an adequate opportunity for the federal plaintiff to assert his federal claims.’ ” Colonial Life & Acc. Ins. Co. v. Medley, 572 F.3d 22, 26 (1st Cir. 2009), quoting Local Union No. 12004, USW v. Massachusetts, 377 F.3d 64, 77 (1st Cir. 2004). “The Supreme Court has held that when state proceedings ‘are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of [abstention] should apply in full force.” Getty Petroleum Corp. v. Harshbarger, 807 F. Supp. 855, 857 (D. Mass. 1992) (Tauro, C.J.), quoting Hicks v. Miranda, 422 U.S. 332, 349 (1975); accord Middlesex County Ethics Committee v. Garden State Bar Ass’n, 457 U.S. 423, 436–437 (1982).
  
                                                             -5-
  
 barred federal court from hearing First Amendment claim that could be raised in state-court judicial review of pending administrative proceeding).
             Finally, Massachusetts has a strong interest in deciding whether its consumer protection regulations are lawful and, if so, whether they have been violated. The Federal government does not have as strong an interest in the enforcement of Massachusetts law.
             Given the limited overlap between the two cases, the limited risk of conflicting decisions, the fact that CAC filed the Federal action in anticipation of this lawsuit, the lack of any comparative advantage in Federal court to decide the First Amendment issue, and Massachusetts’ strong interest in resolving the matter, the Court exercises its “considerable discretion” not to stay consideration of count two. Cf. Exxon Mobil, 479 Mass. at 329–330.
             1.2.2. Intermediate Scrutiny Applies. The Call Regulation restricts commercial speech and is therefore subject to intermediate scrutiny. CAC contends that any government regulation that distinguishes among categories of speech based on content is now subject to strict scrutiny, even if the regulation applies only to commercial speech. That is incorrect. The recent Supreme Court decisions that CAC relies upon did not overrule long standing Supreme Court precedent that limitations on commercial speech, including content-based limitations on a certain category of commercial speech, are not subject to strict scrutiny.
             It appears to be undisputed, and CAC implicitly concedes, that the debt- collection calls at issue here are “commercial speech” within the meaning of First Amendment precedent. Commercial speech is “expression related solely to the economic interests of the speaker and its audience.” Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 561 (1980). Communications made to collect a debt constitute commercial speech. See, e.g., ACA Int'l v. Healey, 457 F. Supp. 3d 17, 26 (D.Mass. 2020) (Stearns, J.); Stover v. Fingerhut Direct Mktg., Inc., 709 F.Supp.2d 473, 479 (S.D. W.Va. 2009).
             Although “[t]he First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation,” Central Hudson, 447 U.S. at 561, it provides “lesser protection to commercial speech than to other constitutionally guaranteed expression,” id. at 563. The commercial speech doctrine allows governments to regulate commercial messages “to protect consumers from misleading, deceptive, or aggressive sales [or other business] practices,” or to require “the
  
                                                             -6-
  
 disclosure of beneficial consumer information,” without being subject to “strict review.” 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 501 (1996). “[T]he government’s legitimate interest in protecting consumers from ‘commercial harms’ explains ‘why commercial speech can be subject to greater governmental regulation than noncommercial speech.’ “ Sorrell v. IMS Health Inc., 564 U.S. 552, 579 (2011), quoting City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 426 (1993).
             Commercial speech is protected by the First Amendment if it concerns lawful activity and is not misleading. Central Hudson, supra, at 566. “Under Central Hudson, the government may freely regulate commercial speech that concerns unlawful activity or is misleading.” Florida Bar v. Went For It, Inc., 515 U.S. 618, 623–624 (1995).
             “Commercial speech that falls into neither of those categories,” like the debt collection calls at issue here, “may be regulated if the government satisfies a test consisting of three related prongs.” Id. Regulation of commercial speech is constitutional  if  “the  asserted  governmental  interest   is   substantial,”   “the regulation directly advances the governmental interest asserted,” and the regulation “is not more extensive than is necessary to serve that interest.” Central Hudson, supra, at 566. Under this test, the government has the burden of establishing “a ‘reasonable fit’ between its asserted interests and its regulation. Naser Jewelers, Inc. v. City of Concord, N.H., 513 F.3d 27, 31 n.1 (1st Cir. 2008), quoting Discovery Network, 507 U.S. at 416. Central Hudson and its progeny mandate a form of “intermediate scrutiny” for government rules that restrict commercial speech. See Milavetz, Gallop & Milavetz,  P.A.  v.  United  States,  559 U.S. 229, 249 (2010).
             The Central Hudson test applies with full force to content-based regulation of commercial speech that distinguishes among speakers based on the subject matter of their speech.[2] See Sorrell v. IMS Health Inc., 564 U.S. 552, 571–572 (2011). “Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.” Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015). “[C]ontent- based restrictions on protected expression are sometimes permissible, and that principle applies to commercial speech.” Sorrell, supra, at 579. “[F]or  example,
 … ‘a State may choose to regulate price advertising in one industry but not in others, because the risk of fraud ... is in its view greater there.’ ” Id., quoting
  
 ---------------------------
  
 [2]
  
                                                             -7-
  
 R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 388–389 (1992). The regulation challenged in Sorrell imposed content-based restrictions on speech on its face,” id. at 563–564, yet the Supreme Court applied the Central Hudson test because it assumed that all affected speech was commercial in nature, id. at 571–572; see also, e.g, Edenfield v. Fane, 507 U.S. 761, 767 (1993) (Florida regulation banning in-person solicitation by certified public accountants was subject to Central Hudson intermediate scrutiny). In sum, “[w]here the government prohibits [or restricts] a category of commercial speech” without placing similar limits on others—a content-based distinction—"the Supreme Court applies [the] intermediate scrutiny test articulated in Central Hudson.” Bulldog Invs. Gen’l P'ship v. Sec'y of Com., 460 Mass. 647, 660 (2011).
             CAC argues that Central Hudson and its progeny are no longer good law and that a content-based rule restricting one kind of commercial speech, but not others, is now subject to strict scrutiny. It asserts that “determining the scrutiny level by the type of speech is a relic of retired precedent.” As support for this position, it points to Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015), and Barr v. American Ass’n of Political Consultants, Inc., 140 S.Ct. 2335 (2020).
             This argument is without merit. Neither Reed nor Barr involved a limitation on commercial speech, neither decision mentions Central Hudson, and neither case overruled or narrowed Central Hudson and its progeny.[3]
             “Reed does not disturb the Court's longstanding framework for commercial speech under Central Hudson.” Massachusetts Ass'n of Priv. Career Sch. v. Healey, 159 F. Supp. 3d 173, 192 (D.Mass. 2016) (Saylor, J.) (collecting cases). The plaintiff in Reed wanted to post signs advertising the time and location of his church’s Sunday services. See Reed, 576 U.S. at 159. The signs were barred under local regulations governing outdoor signs that imposed more stringent restrictions on temporary signs directing the public to meetings of a nonprofit group. Id. at 161. The Supreme Court held that this restriction on non-profits’
  
 ---------------------------
  
 [3]The Court respectfully disagrees with the contrary reading of Reed and Barr in International Outdoor, Inc. v. City of Troy, 974 F.3d 690, 702–706 (6th Cir 2020). Although Massachusetts courts “ ‘give respectful consideration to such lower Federal court decisions as seem persuasive,’ … [they] ‘are not bound by decisions of Federal courts except the decisions of the United States Supreme Court on questions of Federal law.’ ” Commonwealth v. Pon, 469 Mass. 296, 308 (2014), quoting first Commonwealth v. Hill, 377 Mass. 59, 61 (1979), and then Commonwealth v. Montanez, 388 Mass. 603, 604 (1983).
  
                                                             -8-
  
 temporary directional signs was content-based and therefore subject to strict scrutiny. Id. at 164–171. No commercial speech was at issue in Reed.
             The Supreme Court made clear that Barr was “not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity.” Barr, 140 S.Ct. at 2347. The Barr plaintiffs were “political and nonprofit organizations that want[ed] to make political robocalls to cell phones.” Id. at 2343. Such calls were illegal under a Federal statute that prohibited almost all robocalls to mobile phones, but made an exception for calls made to collect a debt owed to or guaranteed by the United States. Id. at 2344–2345. The Court held that this exception made the statute as a whole content-based and subject to strict scrutiny. Id. at 2346.   The plaintiffs in Barr were not seeking to engage in commercial speech, and the challenged statute restricted political and other non-commercial speech in the same manner as it restricted most commercial speech. The Supreme Court rejected the government’s argument “that the legality of a robocall under the statute depends simply on whether the caller is engaged in a particular economic activity, not on the content of speech.” Id. at 2347. It also rejected the argument that “if this statute is content-based because it singles out debt- collection speech, then so are statutes that regulate debt collection, like the Fair Debt Collection Practices Act.” Id. (emphasis in original).
             The Court may not ignore Central Hudson and its progeny on the theory that they were implicitly overruled by Reed and Barr. See Agostini v. Felton, 521 U.S. 203, 237 (1997). As the Supreme Court has repeatedly explained:
 If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [other courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.
 Agostini, supra, quoting Rodriguez de  Quijas  v.  Shearson/Am.  Express,  Inc.,  490 U.S. 477, 484 (1989). So Central Hudson lives and the commercial speech doctrine remains “the law of the land until the Supreme Court decides otherwise.” Cf. Commonwealth v. Runyan, 456 Mass. 230, 234 (2010).
             1.2.3. Applying Intermediate Scrutiny. The Commonwealth has shown that the Call Regulation passes muster under the Central Hudson test and thus is a lawful regulation of commercial speech.
  
                                                             -9-
  
             It is undisputed that the Commonwealth has satisfied two of the three prongs of the Central Hudson test. The Commonwealth has shown that it has a substantial interest in protecting consumers from unfairly aggressive debt- collection tactics and in protecting residential privacy. And it has also shown that the challenged rule directly advances those interests. CAC does not contest and thus implicitly concedes these points. Cf. Cary v. New England Organ Bank, 446 Mass. 270, 285 (2006) (issue waived where “plaintiffs never put the judge on notice that they opposed summary judgment on this theory”).
             The Commonwealth also bears the burden of proving that the limits imposed by the Call Regulation are “not more extensive than is necessary” to achieve the Commonwealth’s interests in protecting consumers’ privacy against unfairly aggressive debt-collection efforts. See Central Hudson, 447 U.S. at 566. “With respect to this prong, the differences between commercial speech and noncommercial speech are manifest.” Florida Bar, 515 U.S. at 632. “[T]he “least restrictive means” test has no role in the commercial speech context.” Ibid.
             The Supreme Court’s commercial speech decisions instead require a fit between a restriction and the government interest it serves “that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.” Id., quoting Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989).
             This approach recognizes “the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires, and provide[s] the Legislative and Executive Branches needed leeway in a field (commercial speech) ‘traditionally subject to governmental regulation.’ ” Fox, 492 U.S. at 481, quoting Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 455-456 (1978). Courts must be “loath to second-guess the Government’s judgment” that a particular regulation of commercial speech burdens no more speech than is reasonably necessary to further legitimate interests. Id., 492 U.S. at 478.
             The Commonwealth’s limit of two unsolicited telephone contacts by a creditor in any seven-day period is reasonable and not unduly restrictive. The Call Regulation is reasonably tailored to allow creditors communicate with debtors because it leaves open “ample alternative channels” for an exchange of information between a creditor and its debtors. Cf. Florida Bar, 515 U.S. at 634. The challenged rule passes muster because it is narrowly focused on
  
                                                             -10-
  
 preventing high-frequency telephone contact that can be harassing, but does not bar all communications between creditors and debtors, places no limit on how frequently a debtor may contact their creditor, does not impose an overall limit on how often a creditor may contact the debtor by phone or otherwise, lets a creditor initiate two contacts by telephone with each debtor in any seven day period, and does not restrict how frequently a creditor may contact a debtor by any other means (such as email or postal mail). See Massachusetts Ass'n of Private Career Schools, 159 F. Supp. 3d at 208 (upholding similar regulation barring for-profit schools from initiating more than two telephonic communications with a prospective student in each seven-day period).
             CAC’s contention that the Commonwealth cannot meet its burden because it did not submit affirmative evidence that the Call Regulation is no more extensive than necessary has no merit. Whether intermediate or strict scrutiny applies, governments may justify speech restrictions “by reference to studies and anecdotes” or “based solely on history, consensus, and ‘simple common sense.’ “ Florida Bar, 515 U.S. at 628, quoting Burson v. Freeman, 504 U.S. 191, 211 (1992). Since CAC has identified “no basis to question the commonsense conclusion that the many alternative channels for communicating necessary information” between a creditor and its debtors are sufficient, the Call Regulation passes constitutional muster. See Florida Bar, supra, at 634; accord Bulldog Invs., 460 Mass. at 675.
             1.3. Due Process Challenge. CAC makes a second constitutional challenge to count two. It argues that the Call Regulation was so vague and uncertain before the Supreme Judicial Court construed in Armata (on June 25, 2018) that enforcing it against calls made during that period would violate constitutional requirements of due process. Once again, the Court is not convinced.
             CAC appears to argue in part that before Armata one could not know whether the Call Regulation applied to unanswered calls. But the SJC found that this assertion—that unanswered calls were not covered—is inconsistent with the “plain meaning” of the regulation, 480 Mass. at 15, which bars creditors from “initiating” more than two telephone communications with a debtor in any seven-day period, id. at 17–18. The SJC explained that “use of the word ‘initiating’ … indicates that a creditor need not be successful in reaching a debtor for the regulation to apply.” Id. at 19. So the Call Regulation was not vague on this point.
  
                                                             -11-
  
             CAC also contends it was unclear whether the Call Regulation applied when the creditor reached the debtor’s phone but did not leave a message. Once again, the SJC disagreed. It did so based on guidance that the Attorney General published in 2013, stating that “unsuccessful attempts by a creditor to reach a debtor may not constitute initiation of a communication if the creditor is truly unable to reach the debtor or to leave a message for the debtor.” Id. at 18.   The SJC concluded that this guidance was reasonable, consistent with “the plain terms of the regulation itself, and thus entitled to “substantial deference.” Id. at 20, quoting Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. 174, 184 (2009). And it held that the Attorney General’s guidance made clear “that attempts by a creditor to reach a debtor via telephone do constitute initiation of communication if the creditor is able to reach the debtor or leave a voicemail message for the debtor,” whether or not the creditor actually left a message. Id. at 20.
             By construing the Call Regulation based on the plain meaning of its provisions and in light of the Attorney General’s reasonable construction, Armata shows that this regulation was not unenforceably vague. A statute or regulation “is void for vagueness if persons of common intelligence must necessarily guess at its meaning and differ as to its application … or if it subjects people to an unascertainable standard” (internal quotation marks and citations omitted). Chief of Police of City of Worcester v. Holden, 470 Mass. 845, 854 (2015). A law “is not to be invalidated under the void-for-vagueness doctrine where the challenged provisions are merely general in nature, requiring a person to conform his or her conduct ‘to an imprecise but comprehensible normative standard.’ Rather, the doctrine is applied to strike down statutes in which ‘no standard of conduct is specified at all.’ ” Johnson v. Martignetti, 374 Mass. 784, 788 (1978), quoting Coates v. Cincinnati, 402 U.S. 611, 614 (1971). “Further, even a vague statute may be made constitutionally definite by giving it a reasonable construction.” Commonwealth v. Arthur, 420 Mass. 535, 539 (1995).
             The SJC has rejected vagueness challenges to statutes with far less precise standards than the Call Regulation. See Holden, 470 Mass. at 854–856 (firearm licensing statute requiring that applicant be a “suitable person,” with no definition of term); Solimeno v. State Racing Comm’n, 400 Mass. 397, 404–405 (1987) (dog racing statute permitting exclusion of licensed trainer “whose presence is detrimental ... to the proper and orderly conduct of a racing meeting”); Gurry v. Board of Public Accountancy, 394 Mass. 118, 126–128 (1985) (statute allowing license suspension for “discreditable conduct for a certified
  
                                                             -12-
  
 public accountant”); Caswell v. Licensing Comm’n for Brockton, 387 Mass. 864, 874–875 (1983) (statute construed to allow video game license denial where “the general good, order and welfare of the community so require”). If those laws are not too vague, then neither is the Call Regulation.
             1.4. Merits. And so, the Commonwealth may press its claim that CAC violated the Call Regulation by calling Massachusetts debtors too frequently. But this is not a claim that can be resolved on summary judgment.
             Both sides rely on expert opinion to make their case. Though the Commonwealth’s expert relied upon undisputed data and records maintained and provided by CAC, his interpretation of that information and the conclusions he drew from it are hotly contested. The Commonwealth’s expert presented his initial analysis in one affidavit, CAC’s expert attacked that analysis in response, and the Commonwealth’s expert then tried to show that those attacks could not have any material impact on his conclusion that CAC committed many violations of the Call Regulation.
             At trial, the finder of fact in this case may come away unpersuaded by the Commonwealth’s expert and for that reason find in favor of CAC on this claim. A jury, or a judge in a bench trial, is never required to accept an expert’s opinions or conclusions, and “may accept or reject them in whole or in part.” L.L. v. Commonwealth, 470 Mass. 169, 183 (2014), quoting Commonwealth v. O’Brien, 423 Mass. 841, 854 (1996). As a result, the Court cannot resolve this claim on summary judgment. See Dennis v. Kaskel, 79 Mass. App. Ct. 736, 741 (2011) (summary judgment not appropriate where reasonable trier of fact could rule for non-moving party).
             2. Repossession Notice Claims. In counts three and four, the Commonwealth claims that CAC sent inadequate notices when it repossessed and sold vehicles belonging to Massachusetts consumers who defaulted on their car loans. Count four asserts that CAC violated the Uniform Commercial Code—Secured Transactions (art. 9) by telling such debtors that they would be remain liable for any unpaid loan balance or deficiency based on the amount received from selling the vehicle, rather than for a deficiency based on the vehicle’s fair market value. Count three asserts that CAC engaged in unfair trade practices in violation of G.L. c. 93A by providing such allegedly defective notices and also by failing to calculate any deficiency after sale based on the fair market value of the repossessed vehicle, and in fact collecting alleged deficiency amounts after such sales that were not based on fair market value.
  
                                                             -13-
  
             CAC has  moved  to  dismiss  the  UCC  claim  but  not  the  c. 93A  claim.  The Commonwealth seeks partial summary judgment as to liability on both claims. The Court will deny CAC’s motion to dismiss count four and allow the Commonwealth’s motion for summary judgment as to both claims.
             2.1. Motion to Dismiss the UCC Claim.
             2.1.1. Standing. CAC argues that the Commonwealth lacks standing to seek statutory damages under the UCC in count four because the Commonwealth itself suffered no injury and the Attorney General cannot bring suit for UCC violations on behalf of individual consumers. These arguments miss the mark.[4]
             The Commonwealth, acting through the Attorney General, has broad power to bring suit as parens patriae to protect or vindicate the interests of individual Massachusetts citizens, where it would be impractical for individual citizens to seek relief on their own behalf.[5] See Commonwealth v. School Committee of Springfield, 382 Mass. 665, 665 n.1 (1981) (suit as parens patriae for the citizens of Springfield, seeking injunction requiring school committee to contract with private schools serve children with special needs); Commonwealth v. Wiseman, 356 Mass. 251, 259 (1969) (suit as parens patriae for inmates held at Massachusetts Correctional Institute at Bridgewater, seeking to enjoin release of documentary film “Titicut Follies”).
  
 ---------------------------
  
 [4]To the extent that CAC contends that claims must be dismissed because the Commonwealth lacks standing, the Court will treat CAC’s motion as seeking dismissal for lack of subject matter jurisdiction under Mass. R. Civ. P. 12(b)(1), even though CAC styles its motion solely as seeking dismiss for failure to state a claim under Rule 12(b)(6). Cf. Indeck Maine Energy, LLC v. Commissioner of Energy Resources, 454 Mass. 511, 516 (2009) (“Standing is an issue of subject matter jurisdiction that is properly challenged by way of a motion to dismiss under rule 12(b)(1)” of the Massachusetts Rules of Civil Procedure).
  
 [5]“Parens patriae means literally ‘parent of the country.’ ” Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 600 (1982). Parens patriae actions have their roots in the English common-law concept that the King or Queen had the right or responsibility or take care of people who were not legally competent to care for themselves or their property. Id. In this country, “[t]his prerogative of parens patriae is inherent in the supreme power of every State” and may be exercised to prevent “injury to those who cannot protect themselves.” Id., quoting Mormon Church v. United States, 136 U.S. 1, 57 (1890).
  
                                                             -14-
  
 CAC cites two Supreme Court decisions that CAC cites regarding parens patriae standing;[6] both concern the jurisdiction of Federal courts under art. III of the United States Constitution and thus have no bearing on whether or when the Commonwealth may bring suit in Massachusetts courts. See Gammella v. P.F. Chang's China Bistro, Inc., 482 Mass. 1, 19 n.22 (2019); see also, e.g., ASARCO Inc. v. Kadish, 490 U.S. 605, 617 (1989) (“We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law….”).
             Under Massachusetts law, the Attorney General has standing to seek damages and equitable relief for a statutory violation “pursuant to the powers conferred by G.L. c. 12, § 10, and in accord with the Attorney General’s common law duty to represent the public interest and to  enforce  public  rights.”  Lowell  Gas, 377 Mass. at 48 (standing to sue utility for fraud, based on allegedly charging rates in violation of rate-setting statute). The Attorney General is authorized and has a duty to “take cognizance of all violations of law … affecting the general welfare of the people,” and to bring “such criminal or civil proceedings … as he may deem to be for the public interest.” G.L. c. 12, § 10.
             The Attorney General’s statutory and common law powers give her standing to bring this claim for an alleged violation of the UCC. “[T]he Commonwealth's interest in protecting the economic well-being of consumers and ensuring that those who conduct business within the state do not jeopardize that well-being” give it standing. See In re Bartel, 403 B.R. 173, 176 (Bankr. D.Mass. 2009). “The Commonwealth has an interest beyond that of each individual in ensuring that those who do business within this state comport with a basic level of fairness in all their dealings” and comply with Massachusetts statutes crafted to ensure that consumers are treated fairly. Id.
             2.1.2. Merits of Claim. In addition to its subject matter jurisdiction challenge about standing, CAC also argues that count four should be dismissed under Rule 12(b)(6) for failure to state any claim upon which relief may be grant. CAC asserts that its alleged violation of G.L. c. 255B, § 20B, which governs retail
  
 ---------------------------
  
 [6]Cf. Alfred L. Snapp & Son, 458 U.S. at 602 (discussing States’ standing to bring suit in federal court against citizens of another state); Pennsylvania v. New Jersey, 426 U.S. 660, 665 (1976) (Supreme Court’s original jurisdiction under art. III over suits between States does not extend to parens patriae suits brought to vindicate purely private interests).
  
                                                             -15-
  
 installment sales of motor vehicles, cannot give rise to a claim for special damages under the UCC. This argument is unavailing.
             Article 9 of the UCC governs secured transactions in general.[7] It provides that where a debtor defaults, and the lender sells the collateral in a “commercially reasonable manner,” the debtor remains liable for any deficiency if the sale proceeds are not sufficient to cover the remaining debt; the debtor is also entitled to any surplus, if there is one. See G.L. c. 9-615. The UCC requires that a lender give notice to a defaulting debtor before disposing of the collateral, including a description of the debtor’s potential liability for any deficiency. See G.L. c. 106, § 9–614(1)(B). And it requires the lender to give notice after the collateral is sold that discloses whether there is a deficiency and, if so, how it was calculated. See G.L. c. 106, § 9–614.
             The UCC “also provides standard form language, including the following statement for pre-sale notices:
 ‘The money that we get from the sale (after paying our costs) will reduce the amount you owe. If we get less money than you owe, you (will or will not, as applicable) still owe us the difference. If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.’ “
 Williams v. Honda Finance Corp., 479 Mass. 656, 668 (2018), quoting G.L. c. 106, § 9–614(3). And it has a related safe harbor provision, stating that “[a] notification following the above form ‘is sufficient, even if additional information appears at the end of the form.’ “ Id. quoting § 9–614(4).
             A separate statute, G.L. c. 255B, governs sale or lease transactions secured by granting an interest in the vehicle. It provides that the UCC applies to such transactions “unless displaced” by c. 255B. This statute requires that any deficiency or surplus must be calculated using the fair market value of the repossessed vehicle, not the actual proceeds from a commercially reasonable sale. See G.L. c. 255B, § 20B.
  
 ---------------------------
  
 [7]A secured transaction is a loan or purchase where the payment obligation is secured by collateral. Buying a car on credit is a common example. The person buying the car pays part of the price up front, borrows the rest, and promises to pay that balance with interest over time. The lender takes a security interest in the vehicle. If the borrower defaults, the lender may repossess and sell the vehicle in an attempt to recoup the unpaid balance.
  
                                                             -16-
  
             As a result, when a creditor repossesses a motor vehicle that serves as collateral for a transaction governed by § 20B, the pre-sale and post-sale notices required by the UCC “must expressly describe the deficiency as the difference between the amount owed on the loan and the fair market value of the vehicle, not the difference between the amount owed and  the  sale  proceeds[.]”  Williams,  479 Mass. at 657–658.
             Count four asserts a viable claim under the UCC. The Commonwealth alleges that CAC sent pre-sale and post-sale notices that were inconsistent with § 20B and therefore violated the UCC.
             CAC argues that even if its notices violated § 20B that would not mean it can be sued under the UCC, because § 20B completely displaced the notice requirements imposed by the UCC.
             That position cannot be squared with Williams. Though § 20B displaces the calculation of a deficiency and the UCC’s inconsistent safe harbor provision, it did not displace the UCC notice requirements or special damages provisions. See Williams, 479 Mass. at 668–669. When it comes to secured sales of motor vehicles, the UCC still requires pre-sale notices that accurately describe debtors’ potential liability for any deficiency, and post-sale notices that accurately calculate any deficiency. See G.L. c. 106, §§ 9-614 & 9-616(b)(1). And it still provides statutory damages for inadequate notices. For unlawful pre- sale notices, statutory damages are set at 10 percent of the principal plus any credit service charge. See G.L. c. 106, § 9–625(c)(2). For unlawful post-sale notices that are “part of a pattern, or consistent with a practice of noncompliance,” statutory damages are $500 for each affected debtor. See G.L. c. 106, § 9-625(e)(5).
             CAC’s insistence that it cannot be sued under the UCC for issuing notices that do not accurately describe any deficiency consistent with § 20B is incorrect. The SJC specifically held that “the notice required by the Uniform Commercial Code will only be considered sufficient if it accurately describes the deficiency under G.L. c. 255B, § 20B.” Williams, 479 Mass. at 669. Thus, notices that describe a debtor’s deficiency as the difference between “the amount you owe” and “the money received from the sale” violate G.L. c. 106, §§ 9-614 & 9-616 and can give rise to statutory damages under § 9-625. See Williams v. American Honda Finance Corp., 907 F.3d 83, 87 (1st Cir. 2018). And it is now settled that Williams applies to all notices subject to the UCC and § 20B, including those
  
                                                             -17-
  
 sent before Williams was decided. See Dellorusso v. PNC Bank, N.A., 98 Mass. App. 84, rev. denied, 486 Mass. 103 (2020).
             2.2. Summary Judgment as to Repossession Notices. The Commonwealth is entitled to partial summary judgment in its favor as to liability on counts three and four.[8] As explained below, by CAC’s own admission it has violated § 20B. And as discussed above, a violation of § 20B is a violation of the UCC. It is also an unfair trade practice that violates G.L. c. 93A. See G.L. c. 255B, § 6 (“A violation of this chapter shall also be a violation of chapter ninety-three A.”)
             The summary judgment record establishes that, before Williams was decided, CAC’s pre-sale and post-sale repossession notices referred to and calculated any deficiency based on sales proceeds rather than fair market value. The Attorney General asked CAC for information about its notices to borrowers regarding the sale of repossessed vehicles, in light of the SJC’s decision in Williams. CAC responded by providing what it said were “exemplars” of the disclosures it issued before Williams and of the revised disclosures that have “been in effect since January 21, 2019.”
             These exemplars show that CAC used language from the UCC safe harbor provision, G.L. c. 106, § 9–614(3), in its notices before Williams, and described any deficiency by reference to sales price, not fair market value. Only after Williams did CAC revise its notices to comply with G.L. c. 255B, § 20B, and described any deficiency by reference to fair market value.
             CAC argues that the particular letters that it sent to the Attorney General as exemplars do not, standing alone, prove any violation. In notes that one of the pre-Williams exemplars was sent to a customer in Michigan, and contends that it cured the other one by sending out a new letter two months after Williams that cited the correct “fair market value” standard for calculating the deficiency owed by that person.
             That may all be true, but it is beside the point. The Commonwealth does not contend that the two particular pre-Williams letters that CAC happened to select as exemplars prove a violation of Massachusetts law. Instead it argues, correctly, that CAC’s representation that these letters were accurate exemplars
  
 ---------------------------
  
 [8]In opposing summary judgment, CAC asserts that the Attorney General lacks standing to bring the c. 93A claim in count four. It relies on the same standing arguments discussed above as to counts two and three. The arguments similarly fail with respect to count four.
  
                                                             -18-
  
 of the standard form language that CAC used in all pre-Williams repossession notices to Massachusetts consumers establishes the violation.
             Though CAC asserts that whether the exemplars accurately show the language that CAC used in its pre-Williams notices is “disputed,” it presents no evidence that calls into doubt its prior representation regarding its self-described “exemplars.” It does not claim or provide any evidence that it provided lawful repossession notices to Massachusetts consumers before Williams was decided. CAC cannot defeat the Commonwealth’s summary judgment by contending that this fact is in dispute without any evidence to the contrary. See Chang v. Winklevoss, 95 Mass. App. Ct. 202, 214, rev. denied, 482 Mass. 1105 (2019) (court may not credit factual assertions “not supported by the summary judgment record”); Bergendahl v. Massachusetts Elec. Co., 45 Mass. App. Ct. 715, 718-719, rev. denied, 428 Mass. 1111 (1998), cert. denied, 528 U.S. 929 (1999) (“mere assertions of the existence of disputed facts without evidentiary support cannot defeat [a] summary judgment motion”).
             Since CAC cannot counter its own admission that it sent unlawful notices, it instead argues that there are disputes of fact regarding how many pre- and post-sale notices it sent to Massachusetts consumers before Williams, and whether some portion of those letters were a “legal nullity” because the consumer recovered the vehicle by paying the amount due. These issues go to issues of damages and remedies, not liability. As a result, these alleged disputes are not material with respect to the Commonwealth’s motion for partial summary judgment as to liability.
             CAC also contends that before Williams the interplay of the UCC safe harbor provision and the requirements of G.L. c. 255B, § 20B, were so unclear that, under the void-for-vagueness doctrine, it would violate due process to hold CAC liable under counts three and four. This vagueness argument fails here for much the same reason it fails with respect to the Call Regulation, as discussed above. The SJC determined what § 20B requires as to repossession of motor vehicles based on the “plain language” of the statute. See Williams,    479 Mass. at 660 & 663. And § 20B expressly provides that the UCC only governs repossession of automobiles to the extent that it is not “displaced” by § 20B (or § 20A). See G.L. c. 255B, § 20B(d). There is nothing vague or obscure about that provision. CAC’s contention that the statutory scheme was impermissibly vague is without merit.
  
                                                             -19-
  
             In a related argument, CAC says that the Commonwealth’s request for summary judgment as to counts three and four should be denied under Mass. R. Civ. P. 56(f) because discovery is not yet complete. The supporting affidavit says that CAC asked for but has not received documents regarding “the Commonwealth’s prior interpretation and enforcement” of § 20B, and asserts that those documents are relevant to CAC’s contention “that the regulatory scheme was unconstitutionally vague.” But the language of the statutory scheme is not unconstitutionally vague, as discussed above. And CAC has not shown that it sought additional discovery that would be relevant to whether its pre-Williams notices were lawful. It has therefore not shown that it is entitled under rule 56(f) to put off a decision on partial summary judgment on these claims. Cf. Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 308 (1991) (Rule 56(f) continuance appropriately denied where further discovery would not be relevant “to the issue being adjudicated in summary judgment.”).
             3. Finance Charge Claims—Motion to Dismiss. In counts five and six, the Commonwealth claims that, although CAC generally told consumers that the interest rate on their car loans was 20.99 percent annually, for many consumers the effective interest rate was higher—and that as a result (i) CAC’s interest rate disclosures were inaccurate in violation of the Massachusetts Consumer Credit Cost Disclosure Act, G.L. c. 140D, and (ii) CAC charged more than the maximum 21 percent annual interest allowed by the Massachusetts Retail Installment Sales of Motor Vehicles Act, G.L. c. 255B, § 14.
             Both counts assert claims under G.L. c. 93A. Allegations plausibly suggesting that CAC failed to make accurate interest rate disclosures in violation of c. 140D or charged a usurious interest rate that exceeded the maximum allowed under c. 255B will state a claim under c. 93A.[9] See G.L. c. 140D, § 34 (“A violation of this chapter, or any rule or regulation issued hereunder, shall constitute a violation of chapter ninety-three A.”); G.L. c. 255B, § 6 (“A violation of this chapter shall also be a violation of chapter ninety-three A.”).
             CAC moves to dismiss both claims on the ground that the complaint alleges only that auto dealers took steps that effectively raised borrowers’ interest rates, and that CAC cannot be held liable for the alleged violations. It argues
  
 ---------------------------
  
 [9]To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege facts that, if true, would “plausibly suggest[] … an entitlement to relief.” Lopez v. Commonwealth, 463 Mass. 696, 701 (2012), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).
  
                                                             -20-
  
 that counts five and six fail “because there is no legal basis to hold Credit Acceptance liable for the alleged acts of third-party Dealers—none of whom have been sued by the Commonwealth.”
             The Court is not persuaded. As explained below, these claims properly seek in part to hold CAC directly liable for its own conduct, in part to hold CAC liable in its capacity as the dealers’ assignee, and in part (with respect to the sale of vehicle service contracts) to hold CAC liable for the alleged misconduct of its agents. Both counts state viable claims.
             3.1. Purchase Price Markup Claim. In count five, the Commonwealth claims that auto dealers markup prices they charge to customers financing their transaction through CAC, that they do so in direct response to financial incentives created by CAC’s business practices, and that these markups therefore constitute part of CAC’s finance charge. It alleges that:
 
 When a consumer applies for a loan, CAC assigns them a score that is based on the calculated likelihood that a borrower with similar characteristics will repay the loan in full. For example, a score of 70% means that CAC expects to collect 70 cents of every loan dollar.
 CAC makes money on loans that it does not expect to be repaid in full by shifting part of that risk to dealers; the lower a buyer’s CAC score, the less money CAC will pay upfront to the dealer.
 Dealers offset CAC’s reduced payments by marking up the prices they charge to customers, with higher markups assessed on customers with lower CAC scores.
 These price markups are a condition of obtaining a loan from CAC, and thus are effectively part of the finance charge imposed and collected by CAC.

Accepting these allegations to be true, as the Court must in evaluating the motion to dismiss,[10] this plausibly suggests that CAC violated c. 140D (and thus c. 93A) by not disclosing this aspect of the finance charge, and that it violated c. 255B (and thus c. 93A) by charging an interest rate that—including the effect of these markups—exceeded 21 percent annually. The Court must therefore deny the motion to dismiss as to this claim.
 
---------------------------
 
[10]See, e.g., Galiastro v. Mortg. Elec. Registration Sys., Inc., 467 Mass. 160, 171 (2014).
 
                                                            -21-
 
            The Commonwealth has stated a viable claim that CAC is directly liable for preparing inaccurate disclosures that misleading consumers as to the true interest rate their motor vehicle loan, and thereby violate c. 140D and c. 93A. It alleges that CAC set all loan terms, prepared all the disclosures, and provided them to dealers—with the understanding that dealers would provide them to consumers, close the loan transaction, and immediately assign the loan to CAC. The fact that CAC did not interact directly with the consumers, and instead prepared the disclosures so that its dealers could close transactions, does not shield CAC from potential liability under c. 93A. Someone who engages in unfair or deceptive business practices may be liable under c. 93A even if they were facilitating a transaction on behalf of some other entity. See Marshall v. Stratus Pharm., Inc., 51 Mass. App. Ct. 667, 677 (2001); The Community Builders, Inc. v. Indian Motorcycle Assocs., Inc., 44 Mass. App. Ct. 537, 557 & 560 (1998).
            The Commonwealth has also stated a viable claim that CAC may be held liable under c. 93A for charging allegedly usurious interest rates that violate c. 255B, under loans that dealers assigned to CAC. At the very least the Commonwealth has stated a claim that CAC may be liable for equitable relief such as cancellation of part or all of the debtors’ outstanding debt, even assuming that the unfair or deceptive acts of imposing an unlawfully high interest rate were committed entirely by the dealers. See Drakopoulos v. U.S. Bank Nat. Ass'n,  465 Mass. 775, 787 n.16 (2013) (debtor may sue creditor’s assignee under c. 93A “for equitable remedies such as cancellation of a debt or rescission of a contract”); Ford Motor Credit Co. v. Morgan, 404 Mass. 537, 543 n.5 (1989) (debtor may sue creditor’s assignee “to discontinue credit payments”).
            CAC’s reliance on G.L. c. 140D, § 33(a), is misplaced. Section 33(a) provides that a civil action for violating the disclosure requirements of c. 140D may only brought against an assignee of a creditor “if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement.” This provision does not limit CAC’s potential liability under c. 93A for its own direct violation of c 140D, or its potential liability under c. 93A for violating the usury provision in c. 255B as the dealers’ assignee. Indeed, § 33(a) may not even bar a claim under c. 93A based on assignee liability for conduct shown to be unfair  by  reference  to  c.  140D.[11] Chapter  93  claims  “are  ‘sui  generis,’ and
---------------------------
 
[11]“General Laws c. 93A ‘is a statute of broad impact’ that prohibits ‘unfair methods of competition’ and ‘unfair or deceptive acts or practices in the conduct of any trade or commerce.’ Exxon Mobil, 479 Mass. at 315–316, quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693–694 (1975).  An act or practice
 
                                                            -22-
 
involve new substantive rights ‘not subject to the traditional limitations of pre- existing causes of action.’ ” Travis v. McDonald, 397 Mass. 230, 232 (1986), quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704 (1975).
            3.2. Vehicle Service Contract Claim. In count six, the Commonwealth claims that CAC authorizes dealers to resell vehicle service contracts (VSCs) to car buyers, CAC only lets its dealers offer VSCs available through CAC, dealers required car buyers to purchase VSCs in order to obtain CAC loans, and as a result the cost of these VSCs constitute part of CAC’s finance charge. Though VSC tells its dealers that they may not require customers to purchase VSCs, the Commonwealth alleges that dealers disregard this policy.
            For much the same reasons just discussed regarding count five, these allegations plausibly suggest that CAC is directly liable under c. 93A for providing inaccurate loan disclosures that do not account for the cost of the VSCs, and is liable—at least for equitable relief—as the dealers’ assignee for charging a usurious interest rate. CAC’s policy that VSCs are not required does not defeat this claim, as the Court must credit the allegation that dealers in fact made VSCs a condition of obtaining a CAC loan. See, e.g., Munoz v. JLO Auto., Inc., No. 3:19-CV-01793 (MPS), 2020 WL 6607789, at *2–*3 (D.Conn. Nov. 12, 2020); Hager v. American Gen’l Fin., Inc., 37 F.Supp.2d 778, 784 (S.D. W.Va. 1999).
            In addition, the facts alleged in the complaint plausibly suggest that CAC gave its dealers actual authority to sell VSCs on its behalf, the dealers were therefore acting as CAC’s agents in selling VSCs,[12] and that as a result CAC is vicariously liable for the agents unfair and deceptive trade practices in mandating VSCs without disclosing their impact on the effective finance rate and in making loans with an annual interest rate higher than 21 percent. The fact that dealers were acting contrary to CAC’s stated policy regarding VSCs does not insulate
 
---------------------------
 
is “unfair” within the meaning of c. 93A “if it falls ‘within at least the penumbra of some common-law, statutory, or other established concept of unfairness’; ‘is immoral, unethical, oppressive, or unscrupulous’; and ‘causes substantial injury to consumers.’ ” Id. at 316, quoting Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016), quoting in turn PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975); see also 940 C.M.R. § 3.16(1) & (2) (act or practice that violates any statute “intended to provide the consumers of this Commonwealth protection” constitutes violation of c. 93A).
 
[12]See Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742-743 (2000) (principal may create agency relationship by giving someone actual or apparent authority to act for it).
 
                                                            -23-
 
CAC from vicarious liability for its agents’ misconduct. To the contrary, CAC may be held liable under c. 93A if its agents engage in unfair or deceptive acts or practices in trade or commerce while acting on CAC’s behalf, even if CAC did not authorize and was not aware of the wrongdoing. See Ramos v. International Fid. Ins. Co., 87 Mass. App. Ct. 604, 610 (2015) (“liability for multiple damages under c. 93A may be imposed upon a principal corporation with no knowledge of its agent's wrongdoing”).[13]
            4. Sale of Securities Claim—Motion to Dismiss. In count seven, the Commonwealth claims that CAC violated c. 93A by using false or misleading statements to sell securities. It is undisputed that CAC securitizes its loans. CAC’s offering documents describe the credit characteristics of loans that CAC selects for sale before the security closing date, and represent that CAC does not expect that the credit characteristics of additional loans that will be added to the sale pool will be materially different from those transferred on the closing date. The Commonwealth alleges that this is false, because CAC consistently and deliberately selects and adds loans after the closing date that have materially worse expected collection rates, on average.
            CAC has moved to dismiss this claim, arguing that (i) the purportedly false statement is merely one of expectation, not fact, and (ii) in any case the differences in credit characteristics before and after each closing date, as alleged by the Commonwealth, are not material. The first argument is wrong and the second cannot be resolved at the pleading stage on a motion to dismiss.
            4.1. False Statement of Fact. This claim is based on statements by CAC, in disclosures to potential investors, that it did “not expect that the characteristics of the Loans and related Contracts purchased during the Revolving Period will be materially different from those transferred on the Closing Date[.]”
 
---------------------------
 
[13]It does not matter that the complaint does not expressly invoke an agency theory of liability. What matters is whether the facts alleged state a claim that CAC may be held vicariously liable because dealers were acting as its agent in selling VSCs, not whether the complaint mentions that legal theory. See generally Gallant v. City of Worcester, 383 Mass. 707, 709 (1981) (complaint may allege facts plausibly suggesting that plaintiff has legally viable claim even if complaint does not name correct legal theory); Republic Floors of New England, Inc. v. Weston Racquet Club, Inc., 25 Mass. App. Ct. 479, 487 (1988) (plaintiff may press any legal theory fairly raised by allegations in complaint, even if that theory is not expressly invoked in the complaint).
 
                                                            -24-
 
            CAC argues that this statement cannot constitute an actionable misrepresentation because it “is a statement of future expectation, not a commitment” (emphasis in original). It relies on the principle that “[a] statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment.” von Schonau- Riedweg v. Rothschild Bank AG, 95 Mass. App. Ct. 471, 497 (2019), quoting Zimmerman v. Kent, 31 Mass. App. Ct. 72, 79 (1991).
            But the Commonwealth alleges that CAC “consistently and repeatedly, in successive securitizations,” selected loans after the closing date that had materially worse credit characteristics. It is reasonable to infer from this allegation, if it can be proved, that CAC knew its representation that it did “not expect” later loans to have materially worse credit characteristics was false, because it actually expected and intended to selected materially inferior loans after the closing dates. In deciding the motion to dismiss, the Court must assume the allegations in the complaint are true and “ ’draw every reasonable inference in favor’ of the nonmoving party” from those allegations. UBS Financial Svcs., Inc. v. Aliberti, 483 Mass. 396, 405 (2019), quoting Champa v. Weston Pub. Sch., 473 Mass. 86, 90 (2015).
            These allegations, that CAC deliberately misrepresented its intentions regarding future selection of loans that would be included in pool sold to investors, state a viable claim that CAC engaged in unfair and deceptive practices in violation of G.L. c. 93A.
            “[S]tatements of present intention as to future conduct” are fraudulent if they “misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage.” McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709 (1990); accord, e.g., Starr v. Fordham, 420 Mass. 178, 187 (1995) (tortious misrepresentation for law firm to represent that business origination would not be significant factor in determining new partner’s share of profits, when defendant actually intended the contrary); Schinkel v. Maxi-Holding, Inc., 30 Mass. App. Ct. 41, 48 (1991) (allegation that corporate officer never intended to issue and transfer corporate shares as promised stated claim for fraud sufficient to withstand motion to dismiss).
            And plausible allegations of deliberate fraud in trade or commerce state a claim under c. 93A. See Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass. App. Ct. 15, 21 (1998).
 
                                                            -25-
 
            4.2. Materiality. CAC also argues that the Commonwealth misunderstands how investors that bought CAC’s securitized loans made money, the alleged misrepresentations were immaterial because investors in the securitized loans only cares about the credit quality of the notes they were buying and not the credit quality of the underlying loans, and in any case the alleged post-closing decreases in expected collection rates were too small to matter.
            But the Commonwealth has alleged that investors actually did care about the underlying credit quality of the loans and that the difference in credit quality between pre- and post-closing loans was significant and material. The Court must assume those allegations are true at this stage of the case.
            For a claim like this, “[t]he determination of materiality is a mixed question of law and fact ordinarily decided by the trier of fact.” Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 58 (2004) (securities fraud claim under G.L. c. 110A, § 410). This is not the rare case were “the alleged misrepresentations or omissions are so obviously unimportant to an investor … that the allegations are inactionable as a matter of law.” Id., quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976).
            The complaint plausibly suggests that reasonable investors would have wanted to know that CAC deliberately selected loans with better expected collection rates before the closing dates of each note, and intended to (and then in fact did) select loans with materially worse expected collection rates after the closing dates. Nothing more is required at this stage to allege materiality.
ORDERS
            Defendant’s partial motion to dismiss counts four, five, six, and seven is denied. The Commonwealth’s motion for partial summary judgment as to liability is denied in part as to count two (the excessive telephone contact claim) and allowed in part as to counts three and four (the repossession notice claims).
@15 March 2021
@/s/Kenneth W. Salinger Justice of the Superior Court
 
                                                            -26-
 
 
xxz